RICHARD BLUNT, Plaintiff in Error, *v.* THOMPSON TOMLIN, DAVID HILLYARD, and SAMUEL BLUNT, Defendants in Error.

### ERROR TO MASON.

Where a purchaser, under a verbal contract for the sale of land, takes possession by consent of the vendor, and makes valuable improvements, and within the time agreed upon for payment, tenders the purchase money, the case is taken out of the statute of frauds and the purchaser is entitled to a specific performance of the oral agreement.

It is no defense for third parties who subsequently purchased of the vendor with full notice, and before the time for payment had expired, that the vendor had disaffirmed the verbal contract, and sold to them before the purchase money was actually paid or tendered. The purchaser is entitled to protection, if he paid or tendered the money within the time agreed upon.

Where a purchaser of land under an oral agreement, has five years in which to make his payments, so that the contract conflicts with two sections of the statute of frauds, he may nevertheless be entitled to a specific performance. The same facts which would take the case out of one section of the statute, will take it out of the other. In such a case, the court should be more cautious in examining the evidence of the oral contract.

A party who makes a tender for a deed under a contract, need not part with the money, until he receives his deed. If the vendor offers to take the money but refuses to make the deed, this is a refusal of the tender, and it is a useless ceremony to count out the money after that.

A tender made in pursuance of a contract for a deed, fixes the rights of the parties, as conclusively as if the money had been actually paid.

PLAINTIFF filed a bill in Mason Circuit Court, May, 1856, to enjoin Tomlin and Hillyard from ejecting plaintiff from land described in bill, and for specific performance of an oral contract. The bill alleges, that in the fall of 1851, plaintiff purchased of Samuel Blunt land described therein; paid part of the purchase money; took possession under and by virtue of the contract, by actual occupancy with his family, erected dwelling-house, fenced and broke eighty acres, and made other valuable improvements. That the land and improvements are worth over $2,000. That complainant was to pay $3 per acre for the prairie (about 150 acres), and $100 for ten acres of

timber. That he was to have from three to five years to complete payment, as it suited his convenience. That within the five years he tendered the full amount of purchase money to Samuel Blunt, and demanded deed. Kept tender good by deposit with clerk. That long before the expiration of the five years, Samuel Blunt sold the land to Tomlin and Hillyard, they having full knowledge of all the facts. Charges the defendants with fraud, and prays for specific performance of contract, and that the injunction remain perpetual.

Defendants answer, (not on oath.) Admit contract, part payment, making improvements, and actual occupancy, under and by virtue of contract. But allege that contract was made by Samuel with Richard and Alexander Blunt, his son. That they were to pay $3.50 per acre for prairie, (no controversy as to timber.) That they were to pay in installments annually, and to complete payment in three years from December 25, 1851. That they did not comply with contract, and rely on statute of frauds as if plead. Deny notice as to Tomlin and Hillyard. Deny tender and an attempt to defraud complainant.

Replications filed December, 1856. Referred to master to take proof.

*George Wandall* testifies, that in Spring of 1852, Samuel Blunt told him that he had sold the land to Richard in the Fall of 1851, at $3 per acre for the prairie, and $10 per acre for timber. That Richard had paid $32 on contract, and was to pay the residue in three years if he (Richard) could, but if he could not, he was to have five years to complete payment. That Richard took possession under the contract, and had resided on the land with his family ever since the Fall of 1853. That Richard had fenced and broke eighty acres of the land, and erected two dwelling-houses, and made other improvements to the value of $600. That defendants all resided in the same neighborhood, and that all the settlement knew where Richard lived. That the witness had frequently seen Hillyard at Richard Blunt's house, and that he heard Tomlin, the other defendant, say that at the time they purchased the land of Samuel, they knew of the sale by Samuel to Richard, but that the contract was not valid, because it was not in writing. On cross-examination, says the use of the land was worth $250.

*Erastus How* testifies, that Richard bought the land in 1851, and commenced improving in 1852. That he (Richard) was to pay $3 for prairie. Plaintiff has resided on land since 1853. That Samuel had told witness that Richard had paid $32.50 on contract. On cross-examination, says he does not

know whether Alexander had any interest or not.    Never heard that he had any interest.    That witness is satisfied that if Alexander had an interest, he would have known it.    Satisfied that Alexander had no interest in the land.

*Alexander Blunt* testifies, that Richard bought the land in 1851, of Samuel, at $3 per acre for prairie (no controversy as to price of timber.)    That witness paid, for his father, $20, on contract.    That in 1852, Richard took possession and commenced improving the land.    That in 1853, Richard moved his family on the land, and has continued to reside thereon ever since.    That witness and E. How commenced making rails for Richard on the timber in 1851, to fence the prairie. That witness had no interest in the land purchased, and has none now; (describes the section of land.)    That witness helped Sweney survey the land, and the land described and surveyed was the land sold by Samuel to Richard.    That Tomlin and Hillyard both knew of the sale to Richard by Samuel, at the time they bought the land in controversy, of Richard.    That Tomlin and Hillyard had seen, prior to their purchase, Richard in possession of the land.    That witness was present at the time when the sale was made by Samuel to Richard, and heard the contract.    Says that Richard was to pay for the land in three years if he could, and if he could not, Richard was to have five years to pay.    On cross-examination, says there was no written contract.

*John M. Sweney*, surveyor, testifies as to the survey and plat, and that Samuel told witness that he (Samuel) had sold the land to Richard, but expected that he would have to take it back, as Richard would not be able to pay for it.    No controversy as to the description of the land.    And that witness obtained his information, as to the land surveyed being the land in controversy, from Alexander Blunt and Samuel.

*J. H. Wandall* testifies, that Samuel told him that he had sold the land that Richard lived on, to Richard, and had given him from one to five years to pay for it, and had received some money on the sale.    That he was afraid that Richard would not be able to pay, and he would have to take it back. This conversation took place in January, 1856.

*Wm. Swiger* testifies, that Samuel told him that he (Samuel) had sold the land that Richard lived on, to Richard.    That he had given Richard a better chance than he would have given a stranger.    That he had given Richard from one to five years to pay for the land in.    That Richard was a poor man, and that he was to have from one to five years to pay for all the land.    The first conversation was in Fall of

1851, the last some time in 1855.   On cross-examination, says that the first talk was in Fall of 1851, and the last conversation in 1855.   That they were standing on the prairie land that Richard now lives on.

*Jacob Propst* testifies, that Samuel told him in 1853 that he (Samuel) had sold the land on which Richard now resides, to Richard.   That Richard was a poor man, and that Samuel had given him from three to five years to pay for the land.   That Richard had paid $20.   On cross-examination, says Richard was not on the land, but was making improvements.

*Geo. Wandall* testifies, that T. P. Cowan asked Samuel if he did not sell the land to Richard.   Samuel said that he did, but Richard would not be able to pay for it.   Mr. Cowan replied, "just make out a deed, and your money is ready for you in three minutes."   Samuel replied, "I will take the money, but I will be damned if I will make the deed."   This was in January, 1856.   Witness heard S. M. Green, attorney for Richard, say, "Samuel, just make out the deed to Richard for that land, and you shall have your money as quick as I can count it; here, I have the gold."   Witness says he saw $100 in gold in Green's hand.   This was in May, 1856.   Witness says he also heard Mr. Cowan tell Samuel that his money was ready for him, and had been for two years if he would have taken it.   Mr. Blunt said he would not take the money.   This last conversation took place in January, 1856.

*Theodore Howell* testifies, that he heard L. M. Green, attorney for Richard, tell S. O. Conwell, attorney for Tomlin and Hillyard, that if they would make out a deed for this land, their money would be ready for them in twenty-five minutes. This was in the Spring of 1856.

*Thomas P. Cowan* testifies, that in the Winter of 1855–56, he, as the attorney of Richard Blunt, demanded a deed for plaintiff, to the land described in the bill, and offered to pay Samuel the amount, or balance on the land, on the rendition of the deed.   Samuel said he would receive the money, but he never would make the deed.   And also, in February, witness heard L. M. Green tell Samuel that he had the money ready, and would pay it over to him if Samuel would make out the deed to the land in controversy to Richard.   Samuel said he would be damned if he would ever make the deed. Cross-examined—Says that at the conversation referred to, he, as attorney for Richard, demanded a deed for the lands on which Richard now resides, stating to Samuel that the

witness had the money ready and would pay all that was due on the land, on the rendition of deed. Also, says he is security for costs.

On behalf of the defendant, *William Pelham* testifies, that he heard Richard say that he had bought the land of Samuel, and that he had to make up money to pay on the land; that the money was due. This was in the Fall of 1854. On cross-examination, says he does not know the amount said to be due at the time.

*Thomas Blunt* testifies, that four or five years ago, he heard Richard say he had bought 140 acres of prairie, and ten acres of timber. That Richard was to pay $100 for ten acres of timber, and $3.50 per acre for prairie; to pay $100 25th December next after contract, and was to have three years to pay the balance, in installments. That he had bought the land for himself and Alexander his son. That Alexander was to have half the land. At another time Richard said he had let Alexander have $50 to pay his half of the $100 payment. Witness says he talked the whole matter all over with Richard, and Richard said the reason he got the land so low, was that Samuel was in debt, and wanted to get out of debt. That Richard told him that they had not entered into writing, but were to do so when the $100 payment was made at Christmas. Witness says, about one year after the first payment was to have been made, heard Richard say that he was going to be so hard run that he feared he would not be able to pay Samuel the payments on the land. Heard Alexander say that he was to have half the land. Heard Alexander say, sometime after the installments were due, that he (Alexander) saw that his father could not pay for the land, and that he would have nothing more to do with it, and let his father sweat it out himself. That they had paid scarcely anything on the land. A short time before the commencement of this suit, he heard Alexander say that his father had gone to get the money, and that he (Richard) intended to have the land yet. Witness said to Alexander that there were no writings, and that they had not paid scarcely anything on the land, and how could they expect to hold the land. Witness heard Tom Cowan say that Samuel was trying to swindle Richard out of his land, and that he (Cowan) intended to wear him (Samuel) out at law, and that he (Cowan) was to have two hundred dollars. On cross-examination, says that Richard had told him that he bought the land for him and Alexander, and that they were to pay for the land. Says that Alexander was under age at the time of contract. Witness says he has not visited Richard's house since he moved on the land. If there

is any hard feeling between him and Richard, he does not know it.

*Daniel Moslander* testifies, that in 1852 he heard Samuel tell Richard he had better get his wheat threshed, and pay him for his land. Richard replied, "Samuel, I know your money is due. I will pay you all off this Fall, and you may go to hell with it." On cross-examination, says this conversation took place five years ago last Fall. Says that Samuel told him that Richard was to have three years to pay for the land, and that if he (Richard) could not pay for it in that time, he (Samuel) was to give him (Richard) two years longer, provided Richard would pay all he could without distressing himself, and enough to lift a mortgage on the land within three years. Says that Richard commenced improving the next Summer after he bought the land, and moved his family on in the Spring of 1854. That Samuel made no objection, and both lived on same farm.

*John Tomlin* testifies, that on 1st March, 1860, Samuel gave witness forty dollars. Told witness to offer it to Richard as a tender of the money paid by Richard to Samuel as a payment made some four years ago on the land. Witness made the tender, and Richard refused to receive it.

*John Barton* testifies, that in Fall of 1853, he heard Richard say that he (Richard) was coming to town to get Geo. Walker to close a mortgage on this land, or that he (Richard) would, witness don't know which, and that he would get George Walker to make him a deed, and he would pay Walker. In 1854–55, he heard Richard say that he had not paid for the land, and could not get it, but that he would have the scamp off of it. On cross-examination, says that he is son-in-law to Samuel. Says Richard moved on the land in 1854.

*Matthew Tomlin* says, that in January, 1856, L. M. Green told Tomlin that he would lose his suit for the land, and that he (Green) and Cowan were engaged to attend to the suit, and if Richard gained the suit, he (Green) would sell the land to Tomlin for the same. Tomlin was to pay Samuel. Witness has heard both Samuel and Richard say that Richard and Alexander were partners in buying the land.

*Powell Ingle*, on the 18th April, 1857, testifies, that in April, 1855, he heard Samuel say that he had sold Richard same land that Richard lived on. That he had received about $70 in part payment, and that he was not going to let Richard have the land, but would sell it all together.

*Geo. Wandall* says, that he has known Richard and Samuel about five years, and Alexander as long. Has had frequent conversations with them about this land. Has never heard

either of them say that Alexander had any interest in the land. That Alexander never acted like he had any interest in the land, and that witness did not believe Alexander had any interest. Also, told Samuel that witness would loan Richard $100 to pay on the land, if he wanted it. Samuel said he would not receive it. This was in Fall of 1854, and in 1855 Samuel told witness that he would not receive any more money on the land from Richard, but that he intended to take the land from Richard. Says that Alexander has been doing business for himself some four years. On cross-examination, says that Samuel told him that he would not receive the $100 that witness offered to loan Richard, because Samuel had sold cattle and sheep, and had enough money to pay Walker. This was at first conversation, and at second, Samuel did not assign any reason why he would not receive any more money on the land.

*Alanson Robinson* testifies, that he heard Samuel say that he had sold the land to Richard, and that Richard was to have from three to five years to pay for it. And that after Samuel had sold the land to Tomlin and Hillyard, Samuel said that all that Richard could get back was the money that he had paid, with interest.

*Alexander Blunt* testifies, that he did not, at any time that he knows of, tell Thomas Blunt that he (Alexander) was interested in the purchase of the land. Never told Thomas Blunt that he (witness) was to pay any part of the purchase money. That he never had, directly or indirectly, any interest in the land. And also, that Thomas and Richard are mad at each other, and have been for six or seven years.

*Thomas P. Cowan* says, that he never told Thomas Blunt that he was to receive $200 as fee in this suit. Never told Thomas Blunt that he (witness) would wear Samuel out at law. But he (witness) was to receive $100 if he gained the suit.

*N. Powell*, master in chancery, testifies, that at a trial before him, as justice of the peace, the question as to the sale of this land came up, when Thomas P. Cowan, attorney for plaintiff in this suit, addressed himself either to Samuel, or his attorney, "You make out a deed to Richard Blunt for this land, and your money is ready in five minutes." He made use of one or the other of these expressions. This took place February 18, 1856.

The court dissolved the injunction, dismissed the bill, and rendered judgment for the defendants; and plaintiff brings the cause to this court.

THOMAS P. COWAN, for Plaintiff in Error.

LYMAN LACEY, for Defendants in Error.

CATON, C. J. We have rarely considered a case addressing itself stronger to the equitable consideration of the court, than this. The case made by the bill, is either admitted by the answers, or is proved by an overwhelming preponderance of the testimony. Indeed the whole case is admitted, except as to the time of payment, and the price of the prairie land. Upon the former point, the bill is sustained by the testimony of one witness, who heard the bargain made, and three or four other witnesses, who testify to the admissions of the defendant, and one witness only, testifies to the admissions of the complainant, tending to support the answer; and upon the second point, the bill is sustained by the testimony of the witness who heard the bargain, and by two other witnesses, who heard the defendant admit, that the price of the prairie land. was three dollars per acre, as stated in the bill, and one states that the complainant said he was to give three dollars and fifty cents per acre. That Tomlin and Hillyard had notice, both actual and constructive, no question can be made.

The case then is this: In 1851, the complainant by a parol agreement, purchased the land in question of the defendant, and was to pay him for the timber lot one hundred dollars, and for the prairie three dollars per acre. That he was to have at his option five years, within which to pay the purchase money, and that upon the payment of the purchase money, the defendant should convey the land to the complainant. That at the time the bargain was made, the complainant paid the defendant twenty dollars, and afterwards a steer worth twelve dollars, or twelve dollars and fifty cents, upon the purchase. Soon after the purchase was made, the complainant took possession of the land under the purchase, with the consent of the defendant, built a house thereon, and enclosed and broke eighty acres of the land, and made other improvements, of the value, in all, of six hundred dollars. That in 1853, the complainant moved his family on to the premises, and has continued to reside thereon ever since. Before the expiration of the five years, the complainant offered to pay, and tendered to the defendant the balance of the purchase money upon receiving a conveyance. The defendant said he would receive the money, but refused, with imprecation, to make the deed.

Does this take the case out of the statute of frauds, which is relied upon by the defendant in his answer? We think it

unquestionably does. The only condition that any case or *dictum* has ever required, and which is not entirely fulfilled here, is that the whole of the purchase money was not actually paid, before Samuel Blunt sold the same land to the other defendant, and thus repudiated the contract with the complainant. But we have met with no case where the purchaser has been required to make payment or tender of the purchase money, before it was due by the terms of the agreement, in order to secure the right of his purchase, where he has taken possession with the consent of the vendor, and made valuable and lasting improvements. Here the complainant, in the confidence of the integrity and good faith of the defendant, took possession of the land, made improvements upon it of greater value than the price of the land itself, and made of it, as he supposed, a permanent home for himself and family. All this the defendant encouraged, at least by his acquiescence, until these valuable improvements were completed—until a piece of wild land was converted into an improved farm, with a comfortable home, and then, as the time for the final payment of the purchase money was approaching, he turned round and sold the land, with all these improvements, to other parties, who have commenced an action of ejectment against the complainant to expel him from his home. The simple statement of the case is revolting to one's sense of moral justice, and shows that here is an attempt to use the statute passed to prevent frauds, for the purpose of perpetrating a gross fraud. It was one of these extreme cases, so revolting to our sense of justice, which first induced the court to set aside the statute, for the very reason just stated, and while we may in general regret that courts have ever been influenced by any consideration, so far as to break in upon the statute, yet, when we meet cases like this, we feel quite resigned to follow the precedents which were well understood when our law was passed, and have thus become a part of it.

Here, if there was not an actual payment of the purchase money, there was a tender of it, within the time in which he had a right by the agreement to make the payment, and a refusal by the defendant. We have said, in *Doyle* v. *Teas*, 4 Scam. 202, that he who tenders for a deed, need not part with his money till he can touch the deed; so he need run no risk for the safety of his money. A refusal to make the deed was, virtually, a refusal to accept the tender, and rendered it even unnecessary for the complainant to go through the formality of counting out the money, for the doing so, after the peremptory refusal by the defendant, would have been an idle form, unnecessary and contemptible in the eye of a court of

equity. The offer to pay, was equivalent to actual payment, so far as fixing the right of the parties in this court is conerned.

One other objection we may notice, and that is, that as this contract was not to be performed in one year, it was obnoxious to another section of the statute of frauds, and that no contract should be enforced which has been declared void by two statutes, and for two reasons. We might answer to this last objection, that it is not relied upon for a defense in the answer, but if it were, it would be as repugnant to the promptings of an enlightened conscience to allow the defendant to succeed in his fraud by the use of one statute, as the other. This feature of the contract may, and no doubt should, make the court more cautious in examining the evidence to prove the contract, but when that is once established to the entire satisfaction of the court, as here, it necessarily passes from the consideration of the case. The complainant was entitled to a decree. The decree of the Circuit Court is reversed, and the suit remanded, with instructions to that court to proceed with the suit consistently with the principles here stated.

*Judgment reversed.*

*Separate Opinion by* BREESE, J. Whilst I admit the opinion of the majority of the Court is in accordance with repeated decisions of the courts of our sister States, and of England, still I cannot concur in it, for the reason, that I feel myself controlled above and beyond all judicial decisions, by the express law of this State, solemnly enacted by the people, through their representatives, and which I deem of imperative and paramount obligation.

The statute is in these words:

"No action shall be brought, whereby to charge any executor or administrator upon any special promise to answer any debt or damages out of his own estate; or whereby to charge the defendant upon any special promise to answer for the debt, default or miscarriage of another person; or to charge any person upon any agreement made upon consideration of marriage, or upon any contract for the sale of lands, tenements or hereditaments, or any interest in, or concerning them, for a longer term than one year; or upon any agreement that is not to be performed within the space of one year from the making thereof, unless the promise or agreement upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith, or some other person thereunto by him lawfully authorized." (Scates' Comp. 541, Sec. 1.)

This is the will of the people of the State, emphatically declared, by the use of words of no doubtful meaning, and inhibitory in their character. No words of inhibition, more imperious than these, could be used in a statute, and it is, in my opinion, the duty of all courts to give full effect to them. The question presented to me is, shall a solemn act of the legislature, containing no ambiguous or doubtful terms, prevail—be carried into full effect—or shall it be evaded, in deference to the authority of respectable courts? Of all the evils incident to our system, that of judicial legislation, going so far as to nullify an act of the legislature, is one of the most pernicious. The apology for this decision, and all similar ones in such cases, is, that this act of the legislature was passed with full knowledge of the decisions of the courts upon it, and that the legislature must be presumed, when making the enactment, to have adopted the judicial construction placed upon it. This is a dangerous principle, where no words are used of doubtful meaning, and where it goes to repeal a statute. My view is, that the legislature, in disregard of those decisions, declared what the law should be, and conferred no power upon the courts to repeal it, or evade it. If they entertained the opinion that it was good policy and wise, that part performance, by payment of part of the purchase money, making improvements, etc., should be proof, equivalent to a note or memorandum in writing, of the contract, it was quite easy for them to say so, and thus save the courts from legislating, and relieve them from the necessity of seeking pretexts, by which to evade or nullify the law.

The courts, not only in Great Britain, but in this country, have often expressed regret, that parol testimony had ever been allowed to take cases out of the operation of this statute. The books abound in such cases. And it is worthy of consideration, how the courts could, in the first instance, be brought to nullify it, and render it, in practice, of but little force or effect. It requires more than an ordinary share of boldness, to declare, judicially, in the teeth of a statute, that an action may be brought and maintained on a contract, not in writing, for the sale of land, when the statute declares, "no such action shall be brought"! I have fully considered and debated this question, in the separate opinion filed, in the case of *Keener* v. *Crull and Wife,* 19 Ill. 192, in reference to the statute of limitations, which has also been frittered away, and "evaded" by the courts. These judicial evasions have not my sanction, and so long as those acts remain on the statute book, I shall feel it my bounden duty to defer to them, yielding to them implicit obedience.

It may be said, as it has often been said, to justify these evasions of this statute, that frauds might be committed by allowing the vendor to retain the payments made on account, and also the benefit of the improvements, and thus fraud would be promoted, rather than prevented. This result need not happen, for the vendee claiming under a parol contract, has his remedy at law or in equity, for the moneys he has advanced, and for the value of his improvements, and such decree, or judgment, as he may obtain, might be made a lien on the land, until he is fully reimbursed all his expenses and outlays. Complete justice, in most cases, might be thus rendered between the parties, and the act preserved inviolate. If not, the fault is not with the law. Let the contracting parties obey the law, and no bad consequences can follow. Judicial legislation is the work of danger; to steer clear of it, is the part of wisdom.