## UNITED STATES v. NORTON.

(District Court, S. D. Florida.   June 23, 1926.)

No. 2085.

1. **Public lands ⬤⟹35(1)—Rights of homestead settler held not prejudicial by previous attempt to enter land not subject to entry.**

Defendant's application for homestead entry was rejected, because the tract had been withdrawn from entry for a public purpose. A part of the tract was later restored to the public domain, subject to entry, by proclamation of the President, and defendant then moved his buildings on such part and filed application to enter the same, continuing to reside on and improve the land. *Held*, that his rights under the second settlement and application were not prejudiced by his previous settlement on land not subject to entry.

2. **Public lands ⬤⟹35(5)—Settler cannot be deprived of rights acquired under law, though inchoate, by action of Executive Department taken under another law.**

While only a vested right in public land can deprive Congress of the power to make other disposition of it, a settler, who has initiated rights under the law, while that law remains in force, cannot be deprived of such rights by the Executive Department, acting under another law.

3. **Public lands ⬤⟹35(5)—Executive Department cannot sell, under townsite law, land in possession of bona fide homestead settler (Act May 14, 1880, c. 89, § 3, 21 Stat. 140 [Comp. St. § 4538]; Rev. St. §§ 2380, 2381 [Comp. St. §§ 4784, 4785]).**

A settler on public land, in possession with the intention in good faith to claim the land under the homestead law (Act May 14, 1880, c. 89, § 3 [Comp. St. § 4538]), has a preferred right to acquire title under that law, in which he is protected against a subsequent sale of the land by the Executive Department under the townsite law (Rev. St. §§ 2380, 2381 [Comp. St. §§ 4784, 4785]).

At Law.   Action by the United States against Lewis G. Norton.   Decree for defendant, on answer setting up equitable defense and asking affirmative relief.

H. L. Underwood, of Washington, D. C., for the United States.

Chas. R. Pierce, of Miami, Fla., for defendant.

JONES, District Judge.   This is an action in ejectment, brought in the name of the United States against Lewis G. Norton, defendant, and seeks to recover from Norton the possession of a certain tract of land in Dade county, Fla., known and described as lot 7, section 2, township 53 south, range 43 east, Tallahassee meridian, containing 41.95 acres.   The declaration is in the usual statutory form, and the defendant has filed thereto an equitable answer in accordance with the provisions of the Act of Congress of March 3, 1915.   Section 274b of the Judicial Code (Comp. St. § 1251b).   Trial was had before the court without a jury upon the issues so joined.

The equitable defense set up is to the effect that the defendant is the owner of the equitable title to the lands, and is entitled to retain possession thereof until permitted by the government authorities to perfect the legal title thereto under the homestead laws, or until patents issue from the United States to the parties who subsequently purchased these lands at a townsite sale thereof, and for a reasonable time thereafter, in order to afford Norton time to assert his alleged rights against the holders of these prospective patents in a proper suit in equity.   The defense so set up is predicated upon the following facts, alleged in the answer and sustained by the testimony:

In 1875 the United States withdrew from the public lands for use for life-saving purposes 10 acres fronting on the Atlantic Ocean in lot 6, section 2, township 53 south, range 43 east, Tallahassee meridian, in Dade county, Fla.   On April 6–10, 1891, a further order, withdrawing "from all forms of disposal" the whole of said lot 6, was made.   Some time after 1875 the government established at this point a life-saving station and built a house of refuge, which has been and now is in charge of an employee or officer of the Coast Guard Service.   This house of refuge was to have been built upon that portion of lot 6 previously withdrawn for that purpose.   It subsequently developed that a mistake in the location was made, and the house of refuge was south of lot 6, and on property not owned by the United States.

In April, 1920, Lewis G. Norton, the defendant in this case, learned that lot 6, which had previously been assessed by the tax assessor of Dade county as the property of one Field, was not owned by Field, but was the property of the United States.   Acting upon this information, Norton, about April 15, 1920, settled upon lot 6 aforesaid, erected a substantial dwelling house and outbuildings

thereon, proceeded to clear and cultivate the land, which at that time was covered with dense tropical growth and was the habitat of wild animals and mosquitoes. After the erection of the house and outbuildings, he moved onto the land with his family and made it his home, with the intention of acquiring title thereto under the homestead laws. Acting upon this intent, in June, 1920, the defendant, Norton, made formal application to the register of the United States land office at Gainesville, Fla., to enter this lot 6 as his homestead. It then developed, and was subsequently brought to his attention, that all of lot 6 had been withdrawn from the public lands, as above stated, and was not subject to homestead entry. For this reason the application of Norton was rejected by the register, and upon appeal to the Commissioner of the General Land Office the rejection was upheld.

In the meantime Norton visited Washington and took up with officials there the fact of his settlement upon these lands, for the purpose of ascertaining if it might be possible for him in some way to perfect his title. As a result of the activities of Norton, and upon a protest filed by him, a prior claim filed by the state of Florida, covering this lot 6 under the Swamp and Overflowed Land Grant Act, was canceled by the Commissioner of the General Land Office, upon a showing that the lands were not swamp or overflowed, which rejection became final.

As a further result of Norton's efforts in Washington, the Secretary of the Treasury decided that the Coast Guard Service did not require this entire lot for its purposes and so advised the President of the United States, and requested that a proclamation be issued withdrawing the south 500 feet of this lot for Coast Guard purposes, and restoring the balance of the lot to the public domain. This was concurred in by the Secretary of the Interior, and under date of March 11, 1921, the President issued a proclamation permanently withdrawing, for purposes of the Coast Guard Service, the south 500 feet of lot 6, and restoring to the public domain, "subject to the public land laws of the United States and to the jurisdiction of the Interior Department," the balance of said lot 6.

Upon the promulgation of this proclamation, Norton returned to Florida, and on March 14, 1921, moved his dwelling house and outbuildings, which were on the south 500 feet of lot 6, to the north portion of this lot, which had been restored to the public domain by the proclamation of the President, at the same time filing a relinquishment of all claims he might have to the south 500 feet of this lot,

onto which the Coast Guard Service moved its house of refuge. Norton proceeded to improve the property so settled upon by him, and by June 10, 1921, had cleared 12 acres of the land, and had planted approximately 10 acres to fruit and vegetables. On March 14, 1921, he filed an application with the register at Gainesville, Fla., to homestead this restored portion of lot 6, and his attorney at the same time applied to the Commissioner of the General Land Office for the immediate protraction on the official plat of the line dividing that portion of lot 6 restored to the public domain from that permanently reserved, in order that Norton might make proper application for homestead entry.

The Commissioner of the General Land Office replied, under date of March 23, 1921, that an order had already been made, "providing for the marking upon the ground of said lot * * * needed to be reserved for life-saving purposes, * * * so that a plat might be constructed showing the areas of the lot needed and not needed for life saving purposes." The survey referred to was made on the ground by the United States on or about May 14, 1921, and the plat thereof was approved by the Commissioner of the General Land Office May 24, 1922, and a copy thereof transmitted to the register of the land office at Gainesville, Fla., under date of June 16, 1922. This plat shows original lot 6 as lots 7 and 8; lot 7 being that portion restored to the public domain (and the basis of this suit), and lot 8 being that portion reserved by proclamation of March 11, 1921, for Coast Guard purposes.

Under date of May 9, 1921, the Commissioner of the General Land Office brought the second homestead application of Norton to the attention of the Secretary of the Interior, suggesting the lands were valuable as town lots, mentioning an offer of $30,000 had been made for same, referring to a report that the lands were in no way suitable for agricultural purposes, and suggesting that same had been improvidently restored to the public domain. The homestead application of Norton was rejected, and on June 10, 1921, the President of the United States issued an executive order withdrawing for townsite purposes lands in lot 6 (now lot 7) restored to the public domain by proclamation of March 11, 1921. This order was issued under the provisions of section 2380, U. S. Revised Statutes, and also sets forth that said lands were to be disposed of under section 2381 of said Revised Statutes.

Under this executive order another survey was made, dividing that portion of lot 6 (now

lot 7) upon which Norton had settled into town lots, and in February, 1924, a public sale of these townsite lots, after being duly advertised, was held, and the lots, or a great number of them, were sold to the highest bidder. Norton had posted notice of his claim to this land and was in actual possession at the time of the sale.

No patents have issued to any of the purchasers at this townsite sale, and none of them have taken any steps to obtain possession of the lots so purchased, and Norton has been since March 14, 1921, and still remains, in actual possession of lot 7, cultivating same as far as he can without interfering with the lot stakes put down by the plaintiff, and making the same his home and that of his family. Norton at all times has been qualified in every way to acquire lands under the land laws of the United States. The land in controversy is adapted to agriculture, and Norton has produced thereon fruits and vegetables, constituting a valuable marketable crop, and similar crops are produced upon the same kind of land by others in this locality.

The land in controversy is not on the shore of any harbor, is not at the junction of any rivers, and is not located at any important portage. The only house within 2½ miles to the south is the house of refuge of the Coast Guard Service, and there is no house for many miles to the north. The Atlantic Ocean is to the east and Biscayne Bay to the west. It is stipulated by the parties to this suit that the legal title to the land in question is in the United States, and that the defendant Norton has been in possession thereof since April, 1920.

The plaintiff contends: First, that Norton's original settlement of the lands while under withdrawal was a trespass, and no rights could flow therefrom; second, that, if any rights could flow therefrom, they are only inchoate, and cannot prevail against the right of the United States to subsequently sell the lands under the townsite law.

[1] While Norton makes no claim under his original settlement upon these lands in April, 1920, and depends entirely upon his settlement of March 14, 1921, I am quite clear that the manner of his original entry could in no way jeopardize his rights in these lands. In Svor v. Morris, 227 U. S. 524, 33 S. Ct. 385, 57 L. Ed. 623, the defendant had settled upon certain lands which at the time had been selected by a railway company under a previous grant. This selection by the railway company was rejected by the Secretary of the Interior while the defendant was still in possession. Six days later, acting under the said land grant, another indemnity selection of the same tract was filed by the assignee of the railway company, which selection was in such form as to overcome the objections to the previous selection which had been rejected.

Passing upon the rights of the defendant, the Supreme Court, speaking through Mr. Justice Van Devanter, says:

"Following the final rejection of the first selection there was an interval of six days, in which the land was not only free from any claim under the land grant, but open to settlement under the homestead law. So, apart from the defendant's earlier efforts, there can be no doubt that by his residence and occupancy during that interval he initiated and acquired a homestead right. He was not disqualified by reason of what he had done before, and, of course, it was not necessary that he should go through the idle ceremony of vacating the land and then settling upon it anew."

[2] To sustain its second contention, that the defendant's right, being inchoate, cannot prevail against the right of the United States to subsequently withdraw and sell these lands for townsite purposes, the plaintiff relies upon Frisbie v. Whitney, 9 Wall. 187, 19 L. Ed. 668, the Yosemite Valley Case, 15 Wall. 77, 21 L. Ed. 82, and other later cases which have followed the rule laid down in Frisbie v. Whitney and the Yosemite Valley Case. The rule laid down in these cases, as I understand it, is to the effect that only a vested right may prevail against the power of Congress to change the laws governing the rights of claimants to the public lands.

In all of these cases, the holding of the Supreme Court of the United States is based upon the fact that Congress has enacted laws affecting the rights of the claimant, before these rights have become vested, and therefore the claimant is bound by these laws. This rule is clearly laid down in Frisbie v. Whitney, as follows:

"On the other hand, it will hardly be contended that anything short of a vested right in this land could deprive Congress of the right which it has as owner and holder of the legal title, and by the express language of the Constitution, to dispose of and make all needful rules and regulations respecting the territory or other property of the United States. The essential inquiry in this case, therefore, is whether complainant had acquired such a vested right, before Congress by law withdrew these lands from the operation of the preemption acts."

The case at bar presents an entirely different proposition. In this case no act of Con-

gress intervened to change the rights obtained by Norton through his settlement on these lands. He bases his claim upon an act of Congress approved May 14, 1880, 21 Stat. 140, c. 89, § 3 (Comp. St. § 4538) in full force at the time he first attempted to settle on these lands, and in full force and effect at all times from then until now.

The distinction between such a condition and that presented in Frisbie v. Whitney and the Yosemite Valley Case has been so often made and explained by the Supreme Court of the United States that it would be useless to enter upon a discussion of it here. Suffice it to say that this question arose, and the distinction was clearly pointed out, at the time of the decision in Frisbie v. Whitney. In that case the court, referring to that class of cases where inchoate rights have been acquired and have not been interfered with by Congress, says (at page 196):

"In all those cases the successful party had established his legal right of preference of purchase over the other, under the law as it stood when the land officers decided the case. And it was the action of those officers, and their disregard of the law in refusing to the party the benefit of this preference in purchase, which this court corrected, by compelling the conveyance of the legal title acquired by this violation of law. But in the case before us, and in those to which the opinions of the Attorneys General refer, it was Congress, the law-making power, which intervened, and, by a new law, withdrew the land from the operation of the pre-emption laws, while the right of preference in purchase remained unexercised, and amounted to no more than this preference. The courts may very properly correct the injustice done by the land officers, in refusing to accord rights, however inchoate, which are protected by laws still in existence, while they can only consider vested rights, when those rights are sought to be enforced in opposition to the repeal or modification of the laws on which they were founded."

See, also, Shepley v. Cowan, 91 U. S. 330, 23 L. Ed. 424; Ard v. Brandon, 156 U. S. 637, 15 S. Ct. 406, 39 L. Ed. 524; Tarpen [Tarpey] v. Madsen, 178 U. S. 215, 20 S. Ct. 849, 44 L. Ed. 1042; Nelson v. Northern Pacific Railway Co., 188 U. S. 108, 23 S. Ct. 302, 47 L. Ed. 406; Svor v. Morris, 227 U. S. 524, 33 S. Ct. 385, 57 L. Ed. 623.

It is clear, therefore, that the instant case does not come within the rule laid down in Frisbie v. Whitney and the Yosemite Valley Case, but is within that class of cases where inchoate rights have been acquired, "which

are protected by laws still in existence." Frisbie v. Whitney, supra.

The Act of May 14, 1880, upon which Norton bases his claim, and sections 2380 and 2381 of the Revised Statutes of the United States (Comp. St. §§ 4784, 4785), the townsite laws, upon which the plaintiff bases its right, were both in full force and effect at the time each party to this suit acted thereunder. There can be no question that these laws are pari materia, as was held by a decision of the General Land Office in Oklahoma v. Galt, 17 Copp's Landowner, 116, wherein it is said:

"It is settled by an unbroken line of decisions that settlers for homestead and townsite purposes are governed by the same rules of law, acquiring their rights in the same way, by actual selection and settlement, and that such rights date from the first initial act."

This rule is clearly set forth in Shepley v. Cowan, 91 U. S. 330, 23 L. Ed. 424, where there were conflicting claims for certain lands in the state of Missouri. One claim was based upon a grant to the state of Missouri by Congress, and the other upon the pre-emption laws of the United States. The court said:

"The party who takes the initiatory step in such cases, if followed up to patent, is deemed to have acquired the better right as against others to the premises. * * * The two modes of acquiring title to land from the United States were not in conflict with each other. Both were to have full operation, that one controlling in a particular case under which the first initiatory step was had."

It is not disputed that the initiatory step in connection with these lands was taken by Norton. He went upon the lands when they were public lands of the United States, when they were unsurveyed and open to settlement, and, being a person qualified under the homestead laws, he acquired certain rights in these lands under the Act of May 14, 1880. The pertinent part of this act is as follows:

"Any settler who has settled, or who shall hereafter settle, on any of the public lands of the United States, whether surveyed or unsurveyed, with the intention of claiming the same under the homestead laws, shall be allowed the same time to file his homestead application and perfect his original entry in the United States land office as is now allowed to settlers under the pre-emption laws to put their claims on record, and his right shall relate back to the date of settlement, the same as if he settled under the pre-emption laws."

The rights under this law, which will be protected by the courts, entitle the settler to acquire title under the homestead laws to land

so settled upon, and allow him "the same time to file his homestead *application* and perfect his original entry in the United States land office as is now allowed to settlers under the pre-emption laws to put their claims on record. * * * "

In other words, having settled on unsurveyed lands, this law gives him 90 days after said lands have been surveyed in which to file his application for homestead entry. The lands in question have since been surveyed, the proper plat thereof made, and a copy filed with the register of the United States land office at Gainesville, Fla., under date of June 16, 1922. The defendant in this case has filed no application for entry under the homestead law since the filing of this plat, as is provided for in the Act of May 14, 1880. He has, however, been prevented from filing such an application by the acts and orders of the General Land Office. When a copy of the proclamation of the President of the United States, dated March 11, 1921, was forwarded to the land office at Gainesville, Fla., instructions were given to the register to allow no entries to be made of the land so restored until further orders from that office, and, when a copy of the plat of said land was furnished this register, instructions accompanied the same, advising that the lands here in controversy had been withdrawn for townsite purposes, and "this plat, therefore, is not a basis for entry or disposal of any public land in section 2."

These instructions from the General Land Office could, in no way, affect Norton's rights. The Supreme Court, in Nelson v. Northern Pacific Railway Co., 188 U. S. 108, 23 S. Ct. 302, 47 L. Ed. 406, in passing upon similar instructions from the Commissioner of the General Land Office, wherein he directed the register for the district "to withhold from sale or entry" certain lands appearing upon an accompanying diagram, said:

"The withdrawal merely from 'sale or entry' * * * was made only out of abundant caution and in accordance with a practice in the Land Department, and did not and could not affect any rights given to homestead occupants by Congress in the acts of 1864 and 1880."

The latter is the act under which Norton claims. Under such instructions, however, it would have been useless for this defendant to have attempted to file his application for entry of these lands. In failing to do so, he loses none of his rights in this connection. A refusal in advance to accept performance excuses an offer to perform, and the law does not require the doing of an idle or futile thing. Blunt v. Tomlin, 27 Ill. 93; Yerkes v. Richards, 153 Pa. 646, 26 A. 221, 34 Am. St. Rep. 721; Lytle v. Arkansas, 9 How. 314, 13 L. Ed. 153; Nelson v. Northern Pacific Railway Co., 188 U. S. 108, 23 S. Ct. 302, 47 L. Ed. 406.

Norton by his equitable answer asks that he be permitted to retain possession of these lands until such time as the Land Office may allow him to perfect his title thereto under the homestead laws, or until patents to said lands shall issue to purchasers at the townsite sale (who are the real parties in interest in this suit), in order that he may then assert, in a proper proceeding, his equitable rights to the title to these lands. It seems quite clear to me, unless this relief is granted, he must lose whatever rights he has acquired to homestead these lands. In Gauthier v. Morrison, 232 U. S. 460, 34 S. Ct. 386, 58 L. Ed. 680, the court says:

"The homestead law in terms subjects unsurveyed public lands, if agricultural and unappropriated, to settlement by persons having the requisite qualifications and intending to comply with its requirements as a means of acquiring the title, and also plainly confers upon the settler the right of possession, without which compliance with those requirements would be impossible. Rev. St. § 2289 et seq.; Act May 14, 1880, 21 Stat. 140, c. 89, § 3; Rev. St. § 2266; Act March 3, 1891, 26 Stat. 1095, c. 561, § 5; United States v. Waddell, 112 U. S. 76, 80 [5 S. Ct. 35, 28 L. Ed. 673]; Sturr v. Beck, 133 U. S. 541, 547 [10 S. Ct. 350; 33 L. Ed. 761]; Nelson v. Northern Pacific Railway Co., 188 U. S. 108, 125 [23 S. Ct. 302, 47 L. Ed. 406]; Scott v. Lattig, 227 U. S. 229, 240 [33 S. Ct. 242, 57 L. Ed. 490, 44 L. R. A. (N. S.) 107]; Wadkins v. Producer Oil Co., 227 U. S. 368, 373 [33 S. Ct. 380, 57 L. Ed. 551]."

[3] In my opinion, when a settler under the authority of the Act of May 14, 1880, has settled upon either surveyed or unsurveyed lands of the United States, for the purpose and "with the intention of claiming the same under the homestead law," and has complied with the law, except where prevented by the acts of the General Land Office, he acquires a right, inchoate though it be, that protects him against the subsequent sale of these lands by the executive branch of the government under the townsite law.

Judgment will be for the defendant, and an order or decree will be entered, affirming his right to the possession of the lands in controversy, as prayed for in his equitable answer.