# NELSON v. NORTHERN PACIFIC RAILWAY COMPANY.

ERROR TO THE SUPREME COURT OF THE STATE OF WASHINGTON.

No. 44. Argued October 16, 17, 1902.—Decided January 26, 1903.

The grant of public lands made by the act of July 2, 1864, c. 217, to the Northern Pacific Railroad Company, embraced only the odd-numbered alternate sections of which the United States had at the time of definite location "full title, not reserved, sold, granted or otherwise appropriated, and free from preëmption or other claims or rights," provided that whenever prior to such definite location any sections or parts of sections had been granted, sold, reserved, "occupied by homestead settlers" or preëmpted or otherwise disposed of, other lands should be selected by the company "in lieu thereof" not more than ten miles beyond the limits of the alternate sections. By the same act the president was directed to cause

the lands to be surveyed forty miles in width on both sides of the entire line of road after the general route was fixed and as fast as might be required by the construction of the road; and it was provided that the odd sections of land "hereby granted" should not be liable to sale or entry or preëmption before or after they were surveyed, except by the company as provided in the act. The general route of the road was fixed in 1873, and in the same year the land office directed the local officers to withhold from "sale or entry" all odd-numbered sections falling within the forty-mile limits of the grant along the line of road.

In 1880 Congress passed an act for the relief of settlers on the public lands. In 1881 Nelson, qualified to enter public lands under the homestead acts, went upon the tract in question and thereafter continuously occupied it as his residence with the intention in good faith to avail himself of the benefit of the homestead acts. In 1884 the railroad company definitely located its line of road, and by November 18, 1886, had completed a section of forty miles coterminous with the land here in controversy.

The land, when occupied by Nelson as a residence, was unsurveyed, and was not surveyed until 1893; but as soon as surveyed, he attempted to enter it under the homestead laws; but his application was rejected by the local land officers. In 1895 the railroad company was given a patent to the land in question. *Held:*

(1) Although the company held a patent for the land in controversy, the occupant was entitled under the local law to judgment if it appeared that he was equitably entitled to possession as against the company.

(2) The occupancy of Nelson, as a homestead settler, was protected by the act of Congress of 1864, although prior to such occupancy the land office had issued the order of withdrawal from entry or sale, based upon the map of general route.

(3) The railroad company acquired no vested interest in the granted lands prior to definite location; and as Nelson was in the occupancy of the land in question as a homestead settler at the time of such location, the land did not pass by the grant to the railroad company; and his title was the better one.

(4) The title of Nelson, if not otherwise protected, was protected by the third section of the act of May 14, 1880, c. 89, which contains a confirmation of the rights of qualified settlers on public lands, whether surveyed or unsurveyed, with the intention of claiming the same under the homestead laws.

(5) The order of withdrawal directing the local land office to withhold from "sale or entry" the odd-numbered sections within the limits of the general route could not prevent the occupancy of land within those sections prior to definite location by one who in good faith intended to claim the benefit of the homestead law; such right of occupancy being distinctly recognized by the act of 1864, and such order of withdrawal not being required by that act. But if this were not so, the act of 1880, in its application to public lands, which had not become already vested in some company or person, must

be held to have so modified the order of withdrawal based merely on general route, that such order would not affect any occupancy or settlement made in good faith, as in the case of Nelson, after such withdrawal and prior to definite location.

THE Northern Pacific Railway Company brought this action in one of the courts of the State of Washington to recover from the plaintiffs in error the southeast quarter of section twenty-seven, township twenty, north of range fourteen, east of the Willamette meridian, in Kittitas County, in that State—the company claiming to be the owner in fee and alleging that the defendants were in unlawful possession of the land.

The defendants denied each of the allegations of the petition, and the case was tried under a stipulation of facts, which for the purpose of the trial were conceded to be true. The facts so conceded were as follows:

The company is a corporation of Wisconsin, and succeeded, prior to the commencement of this action, to whatever right, title or claim the Northern Pacific Railroad Company had, if any, to the land in dispute. The latter corporation was created by an act of Congress approved July 2, 1864, c. 217, granting lands in aid of the construction of a railroad and telegraph line from Lake Superior to Puget Sound on the Pacific coast by the northern route, and by the acts and joint resolutions of Congress supplemental thereto and amendatory thereof. 13 Stat. 365. We will hereafter refer to those sections of the act, upon the construction of which the decision of this case mainly depends.

The railroad company duly accepted in writing the terms of the act of Congress, and on the 29th day of December, A. D. 1864, such acceptance was served on the President of the United States.

The company fixed the *general* route of its road extending coterminous with said land, and within forty miles thereof, by filing a plat of such route with the Commissioner of the General Land Office August 20, 1873. Thereafter, on November 1, 1873, that officer transmitted to the register and receiver of the land office for the district in which the land was situate the following letter of instructions:

" Gentlemen : The Northern Pacific Railroad Company having filed in this department a map showing the general route of their branch line, from Puget Sound to a connection with their main line near Lake Pend d'Oreille in Idaho Territory, I have caused to be prepared a diagram which is herewith transmitted, showing the forty-mile limits of the land grant along said line, extending through your district, and you are hereby directed to withhold from *sale* or *entry* all the odd-numbered sections falling within these limits not already included in the withdrawal for the main-line period. The even sections are increased in price to $2.50 per acre, subject to preëmption and homestead entry only. This withdrawal takes effect from August 15, 1873, the date when the map was filed by the company with the Secretary of the Interior, as required by the sixth section of the act of July 2, 1864, organizing said company."

The letter of the Commissioner and the diagram therein referred to were received and filed in the local land office November 17, 1873.

The land in dispute was within the forty-mile limit of the land grant as designated in the diagram.

On December 6, 1884, the railroad company *definitely located* the line of its railroad, coterminous with and within less than forty miles of the land in controversy, by filing a plat of such line, approved by the Secretary of the Interior, in the office of the Commissioner of the General Land Office; and prior to November 18, 1886, it constructed and completed a section of forty miles of railroad and telegraph line extending over the line of definite location and coterminous with the land here in controversy. The President of the United States having appointed three commissioners to examine the same, and the commissioners having performed that duty reported to the Secretary on the 18th day of November, 1886, that the lines were completed in all respects as required by the act of Congress.

On the 30th of November, 1886, the Secretary transmitted that report to the President with a recommendation that the railroad and telegraph line be accepted and on the 7th day of December, 1886, the President approved that recommendation.

The United States executed and delivered, May 10, 1895, to the railroad company its letters patent, purporting to convey to the company the above tract under the terms and provisions of the act of 1864, and the various acts and joint resolutions of Congress supplemental thereto and amendatory thereof.

In the year 1881, *three* years *before* the *definite location* of the road, the defendant Henry Nelson went upon the above land and *occupied* it, and has since *continuously resided* thereon. It is agreed that he was at the time qualified to enter public lands under the act of Congress approved May 20, 1862, entitled "An act to secure homesteads to actual settlers on the public domain," and under the various acts supplemental thereto and amendatory thereof.

The land when occupied was unsurveyed, and was not surveyed until 1893. But *as soon as surveyed* Nelson attempted to enter it under the homestead laws of the United States in the proper United States district land office. His application was, however, rejected by the register and receiver because, in their opinion, it conflicted with the grant to the Northern Pacific Railroad Company.

The defendant Peter Nelson is in the occupancy of a portion of the land in question under license from his codefendant Henry Nelson.

Upon the facts so stipulated, the judgment was that the railroad company was not the owner, had no claim to and was not entitled to the possession of the land in dispute, and that the defendant Henry Nelson was entitled to remain in possession by virtue of the homestead laws of the United States. Upon appeal to the Supreme Court of Washington that judgment was reversed, and the cause remanded with directions to enter judgment for the company. 22 Washington, 521.

*Mr. James Hamilton Lewis* for plaintiffs in error. *Mr. C. H. Aldrich, Mr. Thomas B. Hardin* and *Mr. Ralph Kaufman* were with him on the brief.

*Mr. James B. Kerr* for defendant in error. *Mr. C. W. Bunn* was with him on the brief.

MR. JUSTICE HARLAN, after making the foregoing statement of facts, delivered the opinion of the court.

1. Before considering the merits of the case it is proper to remark that although the railroad company holds the patent of the United States for the land in controversy, the defendant, according to the laws of the State, was entitled to judgment, if .it appeared that he was equitably entitled to possession as against the plaintiff.    2 Hills' Codes, § 530 *et seq.; Burmeister* v. *Howard,* 1 Wash. Ty. 207.

2. We have seen that the Northern Pacific Railroad Company was created by the act of Congress of July 2, 1864, c. 217, making a grant of lands·in aid of the construction of the road from Lake Superior to Puget Sound.    When that grant was made substantially the entire country between those points was untraveled as well as uninhabited except by Indians, very few of whom, at that time, were friendly to the United States.    The principal object of the grant, as will appear from its language, was to secure the safe and speedy transportation of the mails, troops, munitions of war and public ·stores, by means of a railroad and telegraph, and to that end and in order to bring the public lands into market it was deemed important to encourage the settlement of the country along the proposed route.    The public lands in that vast region were unsurveyed, and it was not known when they would be surveyed.    Congress, of course, knew that if immigrants accepted the invitation of the Government to establish homes upon the unsurveyed public lands, they would do so in the belief that the lands would be surveyed, that their occupancy would be respected, and that they would be given an opportunity to perfect their titles in accordance with the homestead laws.

Such was the situation when the ·act of July 2, 1864, was passed.    Necessarily the act must be interpreted in the light of that situation.    It should not be so interpreted as to justify the charge that the Government laid a trap for honest immigrants who risked the dangers of a wild, unexplored country, in order that they might establish homes for themselves and their families.    And it should not be supposed that Congress had in view

only the interests of the company, which, with the aid of a munificent grant of lands, was empowered to connect Lake Superior and Puget Sound with a railroad and telegraph line.

Let us now see what is the fair import of the act of 1864, under which both parties claim possession.

By the third section of that act it was, among other things, provided as follows, to wit: " That there be, and hereby is, granted to the ' Northern Pacific Railroad Company,' its successors and assigns, for the purpose of aiding in the construction of said railroad and telegraph line to the Pacific coast, and to secure the safe and speedy transportation of the mails, troops, munitions of war, and public stores, over the route of said line of railway, every alternate section of public land, not mineral, designated by odd numbers, to the amount of twenty alternate sections per mile, on each side of said railroad line, as said company may adopt, through the Territories of the United States, and ten alternate sections of land per mile on each side of said railroad whenever it passes through any State, *and* whenever on the line thereof the United States have full title, not reserved, sold, granted, or otherwise appropriated, *and free* from preëmption *or other claims or rights,* at the time the line of said road is *definitely fixed,* and a plat thereof filed in the office of the Commissioner of the General Land Office; and whenever, *prior to said time,* [of definite location,] any of said sections or parts of sections shall have been granted, sold, reserved, *occupied by homestead settlers,* or preëmpted, or otherwise disposed of, *other lands* shall be selected by said company *in lieu thereof,* under the direction of the Secretary of the Interior, in alternate sections, and designated by odd numbers, not more than ten miles beyond the limits of said alternate sections. . . . "

By the sixth section of the act it was, among other things, provided as follows:

" § 6. *And be it further enacted,* That the President of the United States shall cause the lands to be surveyed for forty miles in width on both sides of the entire line of said road, after the general route shall be fixed, and as fast as may be required by the construction of said railroad; and the odd sections of

land hereby granted shall not be liable to sale, or entry, or preemption before or after they are surveyed, except by said company, as provided in this act." The stipulation of facts omits the latter part of section 6 ; but of the words omitted this court will take judicial notice. They are as follows : " But the provisions of the act of September, eighteen hundred and forty-one, granting preëmption rights, and the acts amendatory thereof, and of the act entitled ' An act to secure homesteads to actual settlers on the public domain,' approved May twenty, eighteen hundred and sixty-two, shall be, and the same are hereby, extended to all other lands on the line of said road, when surveyed, excepting those hereby granted to said company. And the reserved alternate sections shall not be sold by the Government at a price less than two dollars and fifty cents per acre, when offered for sale."

The railroad company insists that after the order of withdrawal from " sale or entry " made in 1873 by the Commissioner of the Land Office, and based upon its map of general route, no right could be acquired by a settler upon any odd-numbered alternate section of land within the forty-mile limit indicated by the map of general route. As the lands in question were not surveyed until 1893, the company's contention means that during the twenty years succeeding the withdrawal in 1873 *all* the sections covered by the map of general route which would, upon a survey appear to be odd-numbered alternate sections, were absolutely excluded from occupancy by any settler having in view the homestead laws.

The defendant insists that the act of 1864 recognized the right of an immigrant to occupy any section of the public lands on the general route up to the time of the definite location of the road, provided it was done in good faith with the intention to perfect his title under the homestead laws whenever it became possible to do so, and that if at the time of *definite location* it appeared that he was in the occupancy of an odd-numbered alternate section the railroad company could not disturb him.

By the sixth section of the act of July 2, 1864, it was declared that the odd sections " hereby granted," that is, by that act granted, should not be liable to sale, entry or preëmption before

or after they were surveyed, except by the company, as provided in the act. But we have also seen, looking at the third section, which was the granting section of the act, that Congress did not *grant* every odd-numbered alternate section within the general limits specified, but *only* the odd-numbered alternate sections to which the United States had full ·title, and which. had *not* been previously reserved, sold, granted or otherwise appropriated, *and* which were *free* from preëmption or " other claims or rights " *at the time* the line of the road was *definitely fixed*—giving to the railroad company the right to select lands, within certain limits, in place of such as were found, *at the date of definite location*, to have been disposed of or to be " *occupied by homestead settlers.*"

The first inquiry is whether the railroad company acquired any *vested* interest in the land in dispute by reason merely of the acceptance by the Land Department of its map of *general* route or by reason merely of the withdrawal order of 1873. In other words, did the land, after the *general* route was established, become segregated from the public domain and cease to be a part of the public lands, so as not to be subject to occupancy, in good faith, by homestead settlers, prior to definite location ? These questions have a direct bearing on the present issues; for, if Congress did not intend—as, we think, it did not —that the railroad company should acquire any *vested* interest in these lands, prior to definite location, we can understand why it excluded from its grant any lands " occupied by homestead settlers " at the time of the *definite location* of the road.

The above questions are, we think, distinctly answered in the negative by recent decisions of this court. Let us see if such be not the case.

In *St. Paul & Pacific* v. *Northern Pacific*, 139 U. S. 1, 5, it was held that after a map of a *general* route was filed and *up to definite location*; the grant to the railroad company was in the nature of a "float," and land which previously to definite location had been reserved, sold, granted or otherwise appropriated, or upon which there was a preëmption " or other claim or right " *did not pass by the grant* of Congress.

In *United States* v. *Northern Pacific Railroad Company*, 152

U. S. 284, 296, 298, the court said : " The act of 1864 granted to the Northern Pacific Railroad Company *only* public land, . . . free from preëmption *or* other claims or rights *at the time its line of road was definitely fixed,* and a plat thereof filed in the office of the Commissioner of the General Land Office."

In *Northern Pacific Railroad Company* v. *Sanders,* 166 U. S. 620, 634, 636, it was adjudged that the railroad company " acquired, by fixing its *general* route, *only* an *inchoate* right to the odd-numbered sections granted by Congress, and no right attached to any specific section until the road was *definitely located* and the map thereof filed and accepted. Until such definite location it was competent for Congress to dispose of the public lands on the general route of the road as it saw proper." In the same case the court, after observing that as the lands there in dispute were not free from claims at the date of definite location, it was of no consequence what was done with them after that date, proceeded : " The only ground upon which a contrary view can be rested is the provision in the sixth section of the act of 1864, that ' the odd sections of land hereby granted shall not be liable to sale or entry or preëmption before or after they are surveyed, except by said company, as provided by this act.' But this section is not to be construed without reference to other sections of the act. It must be taken in connection with section three, which manifestly contemplated that rights of preëmption *or other claims and rights might accrue or become attached to the lands granted after the general route of the road was fixed and before the line of definite location was established.* Literally interpreted, the words above quoted from section six would tie the hands of the Government so that even it could not sell any of the odd-numbered sections of the lands after the general route was fixed— an interpretation wholly inadmissible in view of the provisions in the third section. The third and sixth sections must be taken together, and so taken it must be adjudged that nothing in the sixth section prevented the Government from disposing of any of the lands prior to the fixing of the line of definite location, or, for the reasons stated, from receiving, under the existing statutes, applications to purchase such lands as mineral lands."

The principles announced in the *Sanders* case were reaffirmed in *Menotti* v. *Dillon*, 167 U. S. 703, 720, the court adding : " It is true, as said in many cases, that the object of an executive order withdrawing from preëmption, private entry and sale, lands within the general route of a railroad is to preserve the lands, unencumbered, until the completion and acceptance of the road. But where the grant was, as here, of odd-numbered sections, within certain exterior lines, '*not* sold, reserved or otherwise disposed of by the United States, and to which a preëmption or homestead claim may not have attached, at the time the line of said road is definitely fixed,' the filing of a map of general route and the issuing of a withdrawal order did not prevent the United States, by legislation, at any time prior to the definite location of the road, from selling, reserving or otherwise disposing of any of the lands which, but for such legislation, would have become, in virtue of such definite location, the property of the railroad company."

In *United States* v. *Oregon &c. Railroad*, 176 U. S. 28, 43, which involved the conflicting claims of two railroad companies to certain lands and required the court to determine the effect of a map of general route filed by the Northern Pacific Railroad Company, as well as the extent of the grant made to it, the court said : " If therefore the Perham map of 1865 were conceded for the purposes of the present discussion to have been sufficient as a map of ' general route '—and nothing more can possibly be claimed for it—these lands could not be regarded as having been brought by that map (even if it had been accepted) within the grant to the Northern Pacific Railroad Company, and thereby have become so segregated from the public domain as to preclude the possibility of their being earned by other railroad companies under statutes enacted by Congress after the filing of that map and before any definite location by the company of its line." In the same case : " In opposition to the views we have expressed it may be said that the clause in the act of July 25, 1866, providing for the selection under the direction of the Secretary of the Interior of lands for the Oregon Company in lieu of any that should ' be found to have been granted, sold, reserved, occupied by homestead set-

tlers, preëmpted or otherwise disposed of,' shows that Congress did not intend to include in but intended to exclude from the grant to that company any lands that could have been earned by the Northern Pacific Railroad Company by definitely fixing its route and filing its map of definite location. Undoubtedly those lands would be regarded as having been appropriated when the route of the Oregon road was definitely located, if prior to that date the route of the Northern Pacific Railroad had been definitely fixed, and if such lands were within the exterior lines of that route. But, as we have said, these lands were within the limits of the grant of July 25, 1866, and had not, *at that time,* or when the route of the Oregan road was definitely located, been appropriated for the benefit of the Northern Pacific Railroad Company, for the reason that the latter company had not then filed any map of definite location. *The Northern Pacific Railroad Company could take no lands except such as were unappropriated at the time its line was definitely fixed.* It accepted the grant of 1864 subject to the possibility that Congress might, before its line was definitely fixed, authorize other railroad corporations to appropriate lands within its general route, allowing it to select other lands in lieu of any so appropriated. The lands here in dispute were consequently subject to be disposed of by Congress when the act of 1866 was passed ; and (the line of the Northern Pacific Railroad not having been definitely located prior to the passage of the forfeiture act of 1890) the Oregon Company became entitled to take the lands and to receive patents therefor in virtue of its accepted map of definite location." See also *Wilcox* v. *Eastern Oregon Land Co.,* 176 U. S. 51, and *Messinger* v. *Same,* 176 U. S. 58.

The cases above cited definitely determine that the railroad company acquired no vested interest in any particular section of land until after a definite location as shown by an accepted map of its line ; and that until definite location the land covered by the map of general route was a " float," that is, at large.

In support of the proposition that the railroad company acquired an interest in the lands in dispute, upon its general route being established, reference has been made to some expressions

in the opinion of Mr. Justice Field in *Buttz* v. *Northern Pacific Railroad*, 119 U. S. 55, 71 and 72, to the effect that when the general route of that road was made known by a map duly filed and accepted, " the *law* withdraws from sale or preëmption the odd sections to the extent of forty miles on each side. The object of the law in this particular is plain ; it is to preserve the land for the company to which, in aid of the construction of the road, it is granted." But it is evident, in view of both prior and subsequent decisions, that this language is not to be taken literally or apart from the other portions of the opinions of the eminent jurist who delivered the judgment of the court. If, upon the filing and acceptance of the map of *general* route, the *law* withdrew the odd-numbered sections, then the previous holding in many cases that until definite location the grant was a float, with no interest in specific sections being acquired by the railroad company, would be meaningless ; and there would be some difficulty in Congress appropriating such lands prior to definite location. Indeed, it is manifest that the court did not mean to announce any new doctrine in the *Buttz* case ; for Mr. Justice Field, when delivering judgment in that case, said that the charter of the Northern Pacific Railroad Company contemplated " the filing by the company, in the office of the Commissioner of the General Land Office, of a map showing the *definite location* of the line of its road, and *limits* the *grant* to *such* alternate odd sections as have not *at that time*, been reserved, sold, granted, or otherwise appropriated, and free from preëmption, grant, *or other claims or rights ;* . . . Nor is there anything inconsistent with this view of the sixth section as to the general route, in the clause in the third section making the grant operative *only* upon such odd sections as have *not* been reserved, sold, granted, or otherwise appropriated, and to which preëmption and other rights and claims have not attached, *when a map of the definite location has been filed.*"

Further, we had occasion in *Northern Pacific Railroad* v. *Sanders* and *United States* v. *Oregon &c. Railroad Company,* above cited, to limit the broad language in the *Buttz* case which implied that after the general route was fixed the land was withdrawn by the *law* for the railroad company. We

said in the last named case: " This language was too broad if it is construed to express the thought that public lands, when within the exterior lines of a ' general route,' are ' appropriated' from the time the map of such route is filed, so as to prevent them from being granted by Congress to and from being earned by another railroad corporation prior to the filing of a map of definite location by the company designating such general route."

It results that the railroad company did not acquire any *vested* interest in the land here in dispute in virtue of its map of general route or the withdrawal order based on such map; and if such land was not " free from preëmption or other claims or rights," or was " occupied by homestead settlers " at the date of the definite location on December 8, 1884, it did not pass by the grant of 1864. Now, prior to that date, that is, in 1881, Nelson, who is conceded to have been qualified to enter public lands under the homestead act of May 20, 1862, went upon and occupied this land and has continuously *resided* thereon. The land was not surveyed until 1893, but as soon as it was surveyed he attempted to enter it under the homestead laws of the United States, but his application was rejected, solely because, in the judgment of the local land officers, it conflicted with the grant to the Northern Pacific Railroad Company. He was not a mere trespasser, but went upon the land in good faith, and, as his conduct plainly showed, with a view to residence thereon, not for the purposes of speculation, and with the intention of taking the benefit of the homestead law by perfecting his title under that law, whenever the land was surveyed. And for fourteen years before the railroad company by an *ex parte* proceeding, and without notice to him, so far as the record shows, obtained from the Land Office a recognition of its claim, and for sixteen years before this action was brought, he maintained an actual residence on this land. It is so stipulated in this case. As the railroad had not acquired any vested interest in the land when Nelson went upon it, his continuous occupancy of it, with a view, in good faith, to acquire it under the homestead laws as soon as it was surveyed, constituted, in our opinion, a *claim* upon the land

within the meaning of the Northern Pacific act of 1864; and as that claim existed when the railroad company definitely located its line, the land was, by the express words of that act, excluded from the grant.

This view protects the *bona fide* settler in his home, established upon the invitation of the Government under great difficulties, and does no injustice to the railroad company; for, after restricting the grant to such odd-numbered sections of lands, within specified lateral limits, as were free from preemption or "other claims or rights" at the time the line of the road was definitely fixed, Congress, in the act of 1864, as we have seen, proceeded: "And whenever, prior to said time [of definite location] *any* of said sections or parts of sections shall have been granted, sold, reserved, *occupied by homestead settlers, or preëmpted, or otherwise disposed of, other lands shall be selected by said company in lieu thereof,*" etc. The words "occupied by homestead settlers" show that Congress intended by the charter of the Northern Pacific Railroad Company—whatever it may have intended as to other companies receiving grants of public lands—that occupancy by a homestead settler, with the intention to take the benefit of the homestead laws, constituted a *claim* which, existing at the date of definite location, would exclude from the grant land that might otherwise be covered by it. If Congress did not intend thus to protect the occupancy of homestead settlers, the reference to lands being "occupied by homestead settlers," at date of definite location, was meaningless, and it was useless to reserve to the company the privilege of selecting lands in lieu of those lost by such occupancy. Congress knew, when passing the act of 1864, that one going west to establish his home could not know whether the unsurveyed land occupied by him would be an even-numbered or odd-numbered section. Hence, the provision in section 3 in relation to odd-numbered sections "occupied by homestead settlers." The efficacy of such a provision could not be destroyed except by further legislation. It is as if Congress had in words declared that among the "other claims or rights" of which the land must be free at the time of definite location in order that the railroad company might take, were claims aris-

ing out of occupancy by homestead settlers.   Such settlers Congress, in effect, declared should be protected in their rights, and the railroad company should be reimbursed by lieu lands near by.   Nelson's occupancy, we have seen, commenced in 1881, while the definite location of the road occurred in 1884.   That he occupied and continuously resided upon the land in dispute as a homestead settler after 1881 is admitted.

· If it be said that Nelson's claim was that of mere occupancy, unattended by formal entry or application for the land, the answer is that that was a condition of things for which he was not in anywise responsible, and his rights, in law, were not lessened by reason of that fact.   The land was not surveyed until twelve years after he took up his residence on it, and under the homestead law he could not initiate his right by formal entry of record until such survey.   He acted with as much promptness as was possible under the circumstances.

In *Ard* v. *Brandon*, 156 U. S. 537, 543, this court said : " The law deals tenderly with one who, in good faith, goes upon the public lands, with a view of making a home thereon.   If he does all that the statute prescribes as the condition of acquiring rights, the law protects him in those rights, and does not make their continued existence depend alone upon the question whether or no he takes an appeal from an adverse decision of the officers charged with the duty of acting upon his application."   In the same case the court quoted with approval these words from *Clements* v. *Warner*, 24 How. 394, 397 : " The policy of the Federal Government in favor of settlers upon public lands has been liberal.   It recognizes their superior equity to become the purchasers of a limited extent of land, comprehending their improvements, over that of any other person."

In the recent case of *Tarpey* v. *Madsen*, 178 U. S. 215, 219 —which was a contest between the Central Pacific Railroad Company and a preëmptor who sought to avail himself of the act of September, 1841—it was found as a fact that the land in dispute had on it, at the date of definite location, (which was on October 20, 1868,) the improvements of a *bona fide* settler ; and one of the questions in the case was how far the rights of the settler, based upon a *bona fide* occupancy, were affected by

the absence of a local land office in which could be made some
record of his application or entry.   This court said : " It is true
that there was then no local land office in which those seeking
to make preëmption or homestead entries could file their de-
claratory statements or make entries, and the want of such an
office is made by the Supreme Court of the State one of the
main grounds for holding that the land did not pass to the rail-
road company.   We agree with that court fully in its discussion
of the general principles involved in the failure of the Govern-
ment to provide a local land office.   The right of one who has
*actually occupied, with intent to make a homestead or preëmption
entry, cannot be defeated by the mere lack of a place in which to
make a record of his intent.* . . . If Olney was in possession
of this tract before October 20, 1868, [date of definite location]
*with a view of entering it as a homestead or preëmption claim,*
and was simply deprived of his ability to make his entry or de-
claratory statement by the lack of a local land office, he could
undoubtedly, when such office was established, have made his
entry or declaratory statement in such way as to protect his
rights."   In the present case, the settler waited from 1881 to
1893 for the land to be surveyed, and as soon as that was done
he attempted to enter it under the homestead law in the proper
office, but his claim was overruled upon the theory, unfounded
in law, that the land was covered by the railroad grant.

So far we have proceeded on the ground that as the act of
1864 granted to the railroad company the alternate sections to
which at the time of definite location the United States had
full title, not reserved, sold, granted or appropriated, *and* which
were *free* from preëmption or other claims or rights at date of
definite location, and authorized the company to select other
lands in lieu of those then found to be " occupied by homestead
settlers," Congress excluded from the grant any land so occu-
pied with the intention to perfect the title under the homestead
laws whenever the way to that end was opened by a survey.

3.  But the case of the appellant does not depend entirely upon
this view of the act of 1864.   It is placed on impregnable ground
by the act of May 14, 1880, c. 89, entitled " An act for the re-
lief of settlers on public lands," and which was in force when,

in 1881, Nelson settled upon the land in dispute.   The act is as follows: " 1. That when a preëmption, homestead or timber-culture claimant shall file a written relinquishment of his claim in the local land office the land covered by such claim shall be held as open to settlement and entry without further action on the part of the Commissioner of the General Land Office. § 2. In all cases where any person has contested, paid the land office fees, and procured the cancellation of any preëmption, homestead, or timber-culture entry, he shall be notified by the register of the land office of the district in which such land is situated of such cancellation, and shall be allowed thirty days from date of such notice to enter said lands : *Provided,* That said register shall be entitled to a fee of one dollar for the giving of such notice, to be paid by the contestant, and not to be reported.   § 3. That any settler who has settled, or who shall *hereafter settle,* on any of the public lands of the United States, whether surveyed or unsurveyed, with the intention of claiming the same under the homestead laws, shall be allowed the same time to file his homestead application and perfect his original entry in the United States Land Office as is now allowed to settlers under the preemption laws to put their claims on record, and his right shall relate back to the date of settlement, the same as if he settled under the preëmption laws."   21 Stat. 140.

The third section of this statute is a distinct confirmation of the rights of a qualified person who had theretofore settled or should *thereafter* settle " on *any* of the public lands of the United States, whether *surveyed or unsurveyed,* with the intention of claiming the same under the homestead laws; " though, of course, no lands could be deemed of that character which had prior to such settlement become vested in a railroad company in virtue of an accepted map of *definite location.*   It is, as we have seen, a fixed principle in the law relating to the administration of the public lands that a railroad grant is a mere float until definite location, and that prior to that date all lands, within the exterior limits of a general route, are entirely at the disposal of the Government, to be appropriated as it desires. The railroad company, as already shown, acquired, by its accepted map of general route, no interest in any specific lands,

but only a right to take those to which, at the date of definite location, the United States had full title, and upon which there was no claim, and which were not "occupied by homestead settlers." It was, therefore, competent for the United States by the act of 1880—which was four years prior to the definite location of the Northern Pacific Railroad—to give additional rights to those who had then settled, or might thereafter in good faith settle upon any of the public lands. 'Some who have made comments on this act seem to overlook the broad language of section three, and to forget that that section embraces not only those who had theretofore, but those who might *thereafter*, settle on the public lands, whether surveyed or *unsurveyed*. Nelson settled on unsurveyed public land, in which the railroad company had no vested or specific interest and the third section of the act of 1880 was purposeless if it did not allow him to perfect his title under the homestead laws, *as soon as the land was surveyed.*

The meaning we have given to the words "occupied by homestead settlers" in the act of 1864, and what has been said about the act of 1880, finds support in decisions of the Land Department. It will be well in view of the far-reaching consequences of the decision in the present case to refer to some of those decisions.

In *Southern Pacific Railroad (Branch)* v. *Lopez*, 3 L. D. 130, 131 (1884), Secretary Teller said that the act of July 27, 1866, 14 Stat. 292, relating to the Southern Pacific Railroad Company, "granted only such lands as were 'not reserved, sold, granted, or otherwise appropriated, and free from preëmption or *other claims or rights*' at date of definite location; and provided that ' whenever prior to said time any of said sections or parts of sections shall have been ' *occupied by homestead settlers*, preëmpted,' etc., lieu lands might be taken." It will be observed that this was the language of the Northern Pacific Act of 1864. The Secretary proceeded : "Now a homestead entry, which must be made on surveyed lands, would be within the descriptive terms 'other claims' without doubt; but the question material to the case before me, wherein the land was not surveyed, is whether a homestead settlement on unsurveyed

land, with a view to entering it when surveyed, is within said terms. 1 think it is. Construing together the granting words and those respecting the lieu land selection, it is evident that one of the 'other claims or rights' excepting land from the operation of the grant was 'occupation [occupied] by homestead settlers.' The word 'occupied' and the idea conveyed by it were foreign to the homestead law at date of this act, as an essential element in the reservation of land. I need not recite the numerous decisions of the courts and of the Land Department, which settle the principle that under the homestead law it is the 'entry' which reserves land (except for the short period during which it is reserved by settlement under the act of May 14, 1880,) and not any occupation by the claimant before or after it. The language of the granting act is therefore peculiar in this respect, and we are to suppose that it was used deliberately, with knowledge of then-existing law, and for a special and important purpose. We must interpret it in accordance with this evident purpose. *Congress was aware that by this act it was making grants of lands far beyond the line of the government surveys, in regions occupied and to be occupied largely by settlers awaiting the advent of the surveyor to prefer their claims.* By section 6 the homestead law was extended to the even sections after survey, and expressly withheld from the odd sections before and after survey, and yet in section 3 land '*occupied by homestead settlers*' was *excepted from the grant. Congress knew that unsurveyed land could not be* '*entered*' *as homestead; it had in terms prohibited homestead* '*entry*' *on these lands; it was aware that only by such* '*entry*' *could a claim be appropriated and reserved from the grant, without express exception; and therefore in the use of the words* '*occupied by homestead settlers*' *it intended to make such express exception, and to indicate a different kind of appropriation by a class of settlers not within the letter of the homestead law, though clearly within its spirit, namely, those who had made a home on the public domain in advance of the surveys, with the intention of subsequently claiming it under said law.* If this was not the purpose, then the employment of the peculiar language referred to was a vain and useless thing; and such a

thing we are not to suppose Congress had done. 92 U. S. 733. It therefore follows that the land claimed by Lopez, whose proofs are not questioned in any particular, and who preferred his claim promptly upon survey, was 'occupied by a homestead settler' *when the grant to this company took effect, and hence excepted from the operation of the grant.*"

In *Northern Pacific Railroad Company* v. *Anrys,* 10 L. D. 258–9 (1890), which was a contest between the Northern Pacific Railroad Company and a homesteader who had settled on unsurveyed public lands, Secretary Noble said : " It is urged that the land was not subject to the operation of the homestead law at the date of Newland's settlement, because unsurveyed, and that the homestead claim could have attached only by entry. But it must be remembered that the rights of the parties here must be determined by a proper construction of the *railroad grant* rather than of the general *homestead law.* It must be admitted that the ruling in the case at bar is in line with those of the Department for many years. In the case of *Southern Pacific Railroad Company* v. *Lopez,* 3 L. D. 130, the question here presented was fully discussed in connection with a grant framed in words identical with those used in the grant for the Northern Pacific Company, and it was held that a homestead settlement on unsurveyed land with a view to entering it when surveyed is within the term 'other claims,' and that 'it is evident that one of the " other claims or rights " excepting land from the operation of the grant was " occupation by homestead settlers." ' In support thereof it was urged that Congress was aware that by the act in aid of a road extending across the western half of the continent, it was making a grant far beyond the line of government surveys, in regions occupied and to be occupied largely by settlers awaiting the advent of the surveyor to prefer their claims. In this view I concur. It seems beyond question that it was to protect such settlers as described above that Congress excepted from the operation of the grant tracts ' occupied by homestead settlers.' Had Congress intended to extend its protection only to those who had made entry, it would have said so, in other and appropriate words. The ordinary exception of ' lands to which

a homestead right has attached' would have fully protected that class of settlers. But Congress went further and made occupation the test, instead of entry. I do not deem it necessary to cite cases to show that the views of the Department on this point have not changed."

In *Spicer* v. *Northern Pacific R. R. Co.*, 10 L. D. 440, 443, the rights of an Indian were disputed by the Northern Pacific Railroad Company under the act of March 3, 1875, 18 Stat. 402, 420, c. 131, extending the benefit of the homestead laws of the United States, with certain restrictions upon the title when obtained, to Indians twenty-one years of age, or the head of a family having abandoned the tribal relations. Secretary Noble said: " The provisions of this act were in force at the date when the company's rights attached on definite location of its road, and, if the matters alleged relative to the claim of the Indian, Enoch, be true, he was *at that date, and had been for many years prior thereto, living upon the land in question, as his home, with the intention to acquire title thereto as a homestead; he had valuable and permanent improvements thereon, and had cultivated the same for many years, during all of which time he claimed it as his home.* Such a claim, it seems to me, is clearly covered by the excepting clause of the grant to the company, and, if proven, would be sufficient, in my judgment, to defeat the claim of the company to the land. True, the Indian had put no claim of record for the land, but it is well settled by departmental rulings that while such omission might defeat the claim as against a subsequent settler who duly places his claim of record, it will not defeat such claim as against the United States, and the land covered thereby *will be excepted from the operation of any grant for the benefit of a railroad company attaching subsequently to the inception of the settlement right. Northern Pacific Railroad Company* v. *Evans*, 7 L. D. 131, and authorities there cited. It is also well settled that a claim *resting on settlement, residence and improvements*, acquired prior right to the date when the company's rights attached under its grant, is sufficient to except the land covered thereby from the operation of such grant."

In *Northern Pacific Railroad Company* v. *McCrimmon*, 12

L. D. 554, it was said : " In support of this appeal, counsel for
the railroad company contend that Thomas did not claim the
land as government land, but as railroad land, and that, although
the land was excepted from the withdrawal on general route,
yet Thomas did not insist upon the right to take it as govern-
ment land, but was satisfied to claim it under the railroad com-
pany.   Under the ruling of the Department, as announced in
the cases of *Northern Pacific Railroad Company* v. *Bowman,*
7 L. D. 238, and *Northern Pacific Railroad Company* v. *Potter,*
11 L. D. 531, the only question to be determined is, *whether
there was a settlement on the land at date of definite location*
by *one having the qualification to enter the land under the settle-
ment laws,* and, if these facts are shown, *the land would be ex-
cepted from the operation of the grant,* although such settler
might. not have known of his right, but held the land under the
belief that it was railroad land."

In *Northern Pacific Railroad Company* v. *Plumb,* 16 L. D.
80, it appeared that the land in dispute was within the primary
limits of the company's grant as shown by map of definite loca-
tion filed July 6, 1882, and was also within the limits of the
withdrawal on map of general route filed February 21, 1872.
Secretary Noble said : " The only question raised by the appeal
is as to whether the occupancy shown by Plum was sufficient
to defeat the grant.   It appears that in 1881 Plumb took pos-
session of the tract in question, together with an adjoining
forty-acre tract, upon which he resided.   In the spring of 1882
he broke the entire tract in question and enclosed it with a
fence, and has since had possession of and improved the land.
He had never exercised the preëmption right, and was there-
fore duly qualified to claim the land under his settlement right.
In 1886 he contracted to purchase the adjoining forty acres,
upon which he had resided, from the company, and at the hear-
ing it was sought to show that he also claimed the land in
question under the grant at the date of the definite location of
the road, but the testimony will not warrant such a finding.
*Being in possession of the land in question at the date of the
definite location of the road with valuable improvements thereon,
and duly qualified to assert a right thereto under the settlement*

*laws, he had such a right to the land as served to defeat the grant,* and the fact that the claim subsequently asserted by him was under a different law from those providing for settlement can in nowise affect his rights in the premises. Being excepted from the grant by reason of his settlement, Plumb was at liberty to seek title from the Government under any law under which such lands might be taken."

In *Northern Pacific Railroad Company* v. *Benz,* 19 L. D. 229, the land in dispute was within the limits of the grant to the company, as shown by map of definite location filed July 6, 1882, and was covered by the withdrawal upon general route of February 21, 1872. Secretary Smith said: "The present contest is between the railroad company on one part, and Hoy and Benz on the other. If it can be made to appear affirmatively, by good and sufficient testimony, that either of these parties, Hoy or Benz, was *in possession of* said land July 6, 1882, *when the line of the road opposite thereto was definitely fixed, and, at the same time, had the right to perfect title to the same under the preëmption or homestead laws, such possession excepted the land from the grant to the railroad company* and reduced the contest to one between Hoy and Benz; or, rather, to one between Hoy and the legal representatives of Benz, he having died since entering his appeal." It was found that on July 6, 1882, Hoyt was a competent entryman under the homestead laws.

What has been said as to the meaning and scope of the acts of 1864 and 1880 is not inconsistent with anything decided in *Maddox* v. *Burnham,* 156 U. S. 544, and *Wood* v. *Beach,* 156 U. S. 548.

In *Maddox* v. *Burnham* the question was as to the rights of a homestead occupant as against a certain railway company. Referring to the third section of the act of 1880, the court said: " By this section for the first time the right of a party entering land under the homestead law was made to relate back to the time of his settlement. But this act was passed *long after the rights of the railway company had accrued and the legal title had passed to it.* It is not operative, therefore, to divest such legal title, or enlarge *as against such title* any equitable rights which the defendant theretofore had." This was a case therefore in

which the claim based upon occupancy accrued after the legal title had become vested in the railroad company, not a case in which the grant was, as here, a float with no right attached to any specific section.

In *Wood* v. *Beach*—which was a contest between a homestead settler and a railway company—it appeared that the map of the line of definite location was filed December 6, 1866, and a withdrawal followed in 1867, while the occupation and settlement of the homesteader did not commence until June 8, 1870. Of course, the legal title to the sections granted vested in the railway company upon the filing and acceptance of the map of definite location. Besides the withdrawal in 1867 was pursuant to the express command of the act of Congress of July 26, 1866, 14 Stat. 290, § 4, which provided that as soon as the railway company should "file with the Secretary of the Interior maps of its line, designating the route thereof, it shall be the duty of said Secretary to withdraw from the market the lands granted by this act in such manner as may be best calculated to effect the purpose of this act and subserve the public interest." It might well be, therefore, that one whose right, resting upon occupancy, had accrued, as in *Maddox* v. *Burnham*, after the legal title passed to the railroad company, or one who, as in *Wood* v. *Beach*, did not settle upon the public lands until after the railroad company had definitely located its road, and after the lands had been withdrawn from market pursuant to the directions of an express act of Congress, could not, as against the railroad company, acquire an interest in them in virtue of the act of 1880.

Nor is there any conflict between the decision now rendered and *Northern Pacific Railroad* v. *Colburn*, 164 U. S. 383; for, as appears from the opinion and record in that case, the land there claimed to have been occupied by a homestead settler, at the date of definite location, was *surveyed* public land, and the good faith of the occupation was not manifested by an entry, or an attempt at entry, at any time in the local land office. It was held that the inchoate right of the homesteader must be initiated by a filing in the land office. In the present case, as we have seen, the land occupied was unsurveyed, and at the

time of such occupancy, the land being unsurveyed, there could not then have been any filing or entry in the land office.

The case before us is altogether different. Nelson's occupancy occurred after the passage of the act of 1880. While that act did not apply to a railroad company which had acquired the legal title, by a definite location of its road, it distinctly recognized the right prior to such time to settle upon the public lands, whether surveyed or unsurveyed, with the intention of claiming the same under the homestead laws. In occupying the land here in dispute Nelson did not infringe upon any *vested* right of the railroad company ; for there had not been at the date of such occupancy in 1881 any definite location of the line of the railroad, and the land, so occupied, with other lands embraced by the map of *general* route, constituted only a " float," the company having, at most, only an inchoate interest in them, a right to acquire them, *if, at the time of definite location*, it was not " occupied by homestead settlers " nor incumbered with " other claims or rights." The withdrawal merely from " sale or entry " in 1873, based only on a map of the general route of the road, did not identify any specific sections, was not expressly directed or required by the act of 1864, was made only out of abundant caution and in accordance with a practice in the Land Department, and did not and could not affect any rights given to homestead occupants by Congress in the acts of 1864 and 1880. Besides, the order made in 1873 to withhold from *sale* or *entry* all the odd-numbered sections falling within the limits of the general route was without practical value so far as the land in dispute was concerned ; for such land had not been surveyed, and there could not have been any sale or entry of unsurveyed lands. At any-rate, the order of withdrawal directing the local land office to withhold from " sale or entry " the odd-numbered sections within the limits of the *general* route could not prevent the *occupancy* of one of those sections prior to definite location by one who in good faith intended to claim the benefit of the homestead law ; this, because such right of occupancy was distinctly recognized by the act of 1864. But if this were not so, the act of 1880, in its application to public lands, which have not become already vested in some

company or persòn, must be held to have *so modified the order
of withdrawal based merely on general route, that such order
would not affect any occupancy or settlement made in good faith,
as in the case of Nelson, after the passage of that act, and prior
to definite location.* This conclusion cannot be doubted, because
the act of 1880 made no exception of public lands covered by
orders of withdrawal from sale or entry based merely on gen--
eral route, and because also public lands, which had not become
vested in the railroad company, by the definite location of its
line, were subject to the power of Congress.

It results that the Supreme Court of the State of Washington
erred in not affirming the judgment of the court of original ju-
risdiction in favor of the defendants.

*The judgment must be reversed, and the cause remanded for
such further proceedings as may not be inconsistent with this
opinion.*

MR. JÚSTICE BREWER, with whom MR. JUSTICE BROWN and
MR. JUSTICE SHIRAS concur, dissenting.

I dissent from the judgment in this case. It overrules a unan-
imous judgment of this court, one which for nearly twenty
years has been a guide to the Land Department in the construc-
tion of the Northern Pacific Railroad grant. Further, in effect
it declares that an entire section in the act of Congress making
the grant, a section which from the inception of the work of con-
struction has always been regarded by the parties interested as a
provision intended to secure to the company the full measure of
lands granted, is meaningless, and gave the company absolutely
no protection whatever.

It is admitted that the company fixed the general route of
its road coterminous with the road in controversy and within
forty miles thereof, by filing a plat of such route with the
Commissioner of the General Land Office on August 20, 1873,
and that on November 1, 1873, the odd-numbered sections
within the forty-mile limits of this route were by the Land
Department withdrawn from sale or entry and the even-num-
bered sections increased in price to $2.50, notice of which

JUSTICES BREWER, BROWN and SHIRAS, dissenting.

order was immediately filed in the local land office.     In 1881, eight years thereafter, the plaintiff in error for the first time entered upon the lands and commenced its occupation.     It is also admitted that by construction of its road the company has perfected its title to its land grant.     Now, when the company filed its map of general route and obtained from the Land Department the order of withdrawal, it believed that it acquired something.     It did not suppose that it was doing a vain and useless thing.     It did not believe that Congress had cheated it with a delusive expectation of a benefit which it did not intend to give.

Was it justified in such belief?     To answer this it is well to look back to the condition of things at the time the granting act was passed.     In 1862, Congress created the Union Pacific Railroad Company to build a railroad from the Mississippi River to the Pacific Ocean along the only then frequented line of travel.     It made to the company a land grant, one fourth the size of the Northern Pacific grant, and agreed to lend it $16,000 and upwards per mile to aid in the construction, taking a first mortgage on the road as security for the loan.     Notwithstanding this grant of land, this loan of money, and the fact that the road was to be along the only frequented line of travel, capital could not be induced to invest in the enterprise.     Two years thereafter, and in 1864, Congress passed an amendatory act which doubled the land grant, making it half as large as that of the Northern Pacific, and agreed to take as security for its loan a second mortgage, giving to the company the right to place a first mortgage on the road in an amount equal to the government loan.     And only after this large financial assistance and increased land grant was the work of construction commenced.     On the same day Congress passed the act incorporating the Northern Pacific Railroad Company and making to it its grant.     It promised no assistance in money, but only in lands. In order to give the company assurance that it would obtain its full grant it placed in the act section 6, the section which this court now holds is absolutely ineffectual therefor.     That section reads :

" *And be it further enacted,* That the President of the United

States shall cause the lands to be surveyed for forty miles in width on both sides of the entire line of said road, after the general route shall be fixed, and as fast as may be required by the construction of said railroad; and the odd sections of land hereby granted shall not be liable to sale, or entry, or preëmption before or after they are surveyed, except by said company, as provided in this act; but the provisions of the act of September, eighteen hundred and forty-one, granting preëmption rights, and the acts amendatory thereof, and of the act entitled 'An act to secure homesteads to actual settlers on the public domain,' approved May twenty, eighteen hundred and sixty-two, shall be, and the same are hereby, extended to all other lands on the line of said road, when surveyed, excepting those hereby granted to said company. And the reserved alternate sections shall not be sold by the government at a price less than two dollars and fifty cents per acre, when offered for sale."

At the time of the passage of the act the entire body of the country from the western boundary of Minnesota to the Cascade Range was unoccupied, untraveled, and almost wholly unexplored. As said by Senator Hendricks, when the bill was before the Senate: "Everybody can see at a glance that it is a work of national importance. It proposes to grant lands in a northern latitude where, without the construction of a work like that, the lands are comparatively without value to the government. No person acquainted with the condition of that section of country supposes that there can be very extensive settlements until the government shall encourage those settlements by the construction of some work like this." And by Senator Harlan, the chairman of the Committee on Public Lands: "The Committee on Public Lands agree to report this bill favorably on account of the vast consequence that will attach to the completion of the road. The land is to be conveyed to the company only as the road progresses. The committee were of opinion that if the road should be built the government could well afford to give one half the land, for the distance of forty miles on each side of the road, to secure its completion. If it should not be built, no lands will have been conveyed." In other words, the proposition was to give half of the lands within forty miles

of the road to the company—not to give as much land as would be equal to half the lands within forty miles of the road, but to give half of those lands.   The difference is obvious.   The construction of a railroad increases the value of contiguous lands.   Congress doubles the price of the even-numbered sections which it retains.   It makes no little difference to a company whether it receives lands along the line of the road which it constructs, lands which have been increased in value by reason thereof, or an equal amount of lands hundreds of miles away and not so increased in value.

The withdrawal was not left to the discretion of the company, but was to be made by the President, after the general route had been fixed, and " as fast as may be required by the construction of said railroad."   True, the language is that he " shall cause the lands to be surveyed ; " but this, coupled with the prohibition against sale or entry, was tantamount to a direction to withdraw, and has always been so regarded by the Land Department and all parties interested.   Thus he was to determine whether the time had arrived for a withdrawal.   The withdrawal was in fact made.   The President exercised his judgment and decided that the time had arrived for a withdrawal, and the Land Department through all its officials proceeded to act accordingly.   The direction in the withdrawal was " to withhold from sale or entry all the odd-numbered sections falling within these limits."   Surely this action of the President and the Land Department is entitled to the highest consideration.   As said by Chief Justice Marshall in *Cohens* v. *Virginia*, 6 Wheat. 264, 418 : " Great weight has always been attached, and very rightly attached, to contemporaneous exposition."   See the many authorities on this proposition collected in *Fairbank* v. *United States*, 181 U. S. 283, 307.

But notwithstanding this section, notwithstanding the action of the executive officers in directing a withdrawal of this land from sale or entry, it is now held by the court that it was subject to homestead entry, and that the entryman acquired a right to obtain title by an entry made eight years after the withdrawal.   Of course, as I said, such a ruling nullifies the section.   A withdrawal from sale or entry which leaves un-

affected the right of purchase or entry is an irreconcilable con-
tradiction. But can there be any reasonable doubt as to the
meaning of section 6 or that Congress intended exactly what
was done by the executive officers, to wit, the withdrawal of
all the odd sections within the forty-mile limit from sale, entry
or preëmption? The significant words are these: " The odd
sections of land hereby granted shall not be liable to sale, or
entry, or preëmption before or after they are surveyed, except
by said company." Now it is said in the opinion of the major-
ity that section 3 defines what is " hereby granted " as " every
alternate section " to which " the United States have full title,
not reserved, sold, granted or otherwise appropriated, and free
from preëmption or other claims or rights at the time the line
of said road is definitely fixed," that those lands, and those
only, are the ones not liable to sale, entry or preëmption, ex-
cept by the company. It will help to write out the sentence
with a substitution for the words " hereby granted " of the
definition thereof which is presented, and it will read substan-
tially as follows: The odd sections of land within the with-
drawal limits to which the United States have full title, not
reserved, sold, granted or otherwise appropriated, and free from
preëmption or other claims or rights at the time the line of
the road is definitely fixed shall not from the time of the with-
drawal until the filing of the map of definite location be liable
to sale, entry or preëmption before or after they are surveyed,
except by the company. Or, to put it in another form, the odd
sections within the withdrawal limits, which no one purchases
or enters before the filing of the map of definite location, shall
not be purchased or entered by anybody except the company.
It would be a failure of due respect to Congress to use lan-
guage adequately expressive of the absurdity of such legisla-
tion. But Congress never meant any such thing. While it
may be that the use of the words " hereby granted " was un-
fortunate, yet what was intended is clear. Congress intended
to grant the odd-numbered sections, and retain the even-num-
bered, and while in the granting clause some qualifications were
placed in respect to the odd-numbered sections, in order to pro-
tect individual rights then existing, or which Congress might

thereafter specifically create, yet as Congress was here not attempting a precise definition of what should pass by the grant, it used the term "granted lands" as descriptive generally of the odd-numbered sections, to distinguish them from the land retained, the even-numbered sections. It obviously intended that no rights should be acquired, either by sale, entry or preemption, to any of the odd-numbered sections after the filing of the map of general route, and this whether the lands were surveyed or unsurveyed. This is made clear by the last sentence in the paragraph. It says, "and the reserved alternate sections shall not be sold by the government at a price less than two dollars and fifty cents per acre." Clearly that meant all the even-numbered sections, and not simply those which happened to be alternate to odd-numbered sections passing to the company. The truth is that in section 3 Congress defines specifically and carefully the lands which it granted. Its attention was directed in that clause to the matter of definition. While in section 6 it was not attempting to define, but to provide for a withdrawal before the filing of the map of definite location, and was simply endeavoring to make effective rights which it intended should accompany such withdrawal.

Again, in *Hewitt* v. *Schultz*, 180 U. S. 139, it was held that the withdrawal directed by Congress in section 6, coupled with the provision extending homestead and preëmption rights to all other lands on the line of the road, created an implied prohibition of any withdrawal of lands within the indemnity limits provided in section 3. It is unquestioned that, whenever a grant had been made of lands, the power of the Land Department to withdraw such body of lands, as might seem reasonably necessary for the satisfaction of the grant, had been frequently upheld by this court. See the long list of cases cited in the dissenting opinion on page 159. There is no express prohibition of like action by the Land Department in respect to lands within the Northern Pacific indemnity limits, and the judgment was based solely on the implied prohibition above referred to. The opinion of the court rested mainly on the rulings of the Land Department, as primarily expressed in the opinion of Secretary Vilas in *Northern Pacific Railroad Com-*

*pany* v. *Miller*, 7 Land Dec. 100, from whose opinion large quotations were made, and in respect to rulings of the Land Department generally, it was said, conceding that the question involved was one of doubt (p. 157): .

" ' It is the settled doctrine of this court,' as was said in *United States* v. *Alabama Great Southern Railroad*, 142 U. S. 615, 621, ' that, in case of ambiguity, the judicial department will lean in favor of a construction given to a statute by the department charged with the execution of such statute, and, if such construction be acted upon for a number of years, will look with disfavor upon any sudden change, whereby parties who have contracted with the government upon the faith of such construction may be prejudiced.' "

Turning to the opinion of Mr. Secretary Vilas, we find him saying (pp. 110, 111, 113, 119):

" But a peculiarity in legislation of this character is found in the sixth section of the act, in which a provision authorized the ' general route ' to be fixed, and required lands to be surveyed for forty miles in width on both sides of the entire line so fixed, and directed that the odd-numbered sections granted by the act should not be liable to sale or entry or preëmption before or after they were surveyed, except by said company. In the language of the Supreme Court, in *Buttz* v. *Northern Pacific R. R.*, 119 U. S. 71 : . ' The act of Congress not only contemplates the filing by the company, in the office of the Commissioner of the General Land Office, of a map showing the definite location of the line of its road, and limits the grant to such alternate odd sections as have not, at that time, been reserved, sold, granted, or otherwise appropriated, and are free from preëmption, grant, or other claims or right ; but it also contemplates a preliminary designation of the general route of the road, and the exclusion from sale, entry, or preëmption of the adjoining odd sections within forty miles on each side until the definite location is made.'

" The facts which have been recited, show beyond all reasonable question that the privilege given to the company of fixing, first, a line of general route, upon the basis of which the odd-numbered sections within forty-mile limits on either side were

to be withdrawn from sale or entry or preëmption before and after survey, was fully exercised by the company in Washington Territory, from the eastern boundary to the mouth of the Walla Walla River, and thence along the Columbia to the first range line west of the Willamette principal meridian, and thence north to the international boundary, by its filing and the department's approval of its maps of location on the 30th of July, 1870.   These maps and the action taken thereon fully met every requirement of the statute in that behalf.   The company, by resolution fixed this line as the basis of withdrawal, made its formal request that the land should be withdrawn thereon, the line was plainly and sufficiently described, the department accepted it, and applied the statutory consequence by directing the local land officers in Washington Territory to withdraw the odd-numbered sections along that line as far north as the town of Steilacoom, first, for a width of twenty miles on either side, and, later in the same year, within the limit of an additional twenty miles; and also by increasing the minimum price of the even-numbered sections within the same limits to two dollars and fifty cents per acre.   Thus the action of the company and of the department coöperated to give official determination to the fact upon which the statute became applicable, both to withdraw the odd-numbered sections and to double the minimum price of the even-numbered sections, and both effects were formally recognized and declared.   It cannot be doubted that, had no other action been taken before the line of the road for construction was definitely located, this action in regard to the line of the general route of 1870, must have remained continuously operative upon all lands within the limit of forty miles on either side of the line so established.   So obvious is this, indeed, that from the mouth of the Walla Walla River, westwardly along the Columbia, that withdrawal remains to this day obligatory and operative by force of the statute and of that location.  .  .  .   By virtue of that withdrawal the odd-numbered sections within forty miles of all that portion of the route lying east of the Columbia remained for nearly two years at least segregated from the public domain, and all purchasers of the even-numbered sections

were required to pay the double minimum price for the land they bought. . . . Having provided the condition upon which a withdrawal of the public domain should be operative upon a preliminary general route for the benefit of this company, without any latitude of authority for any other, the legislative will must be regarded as exclusive of any other. . . . Thus, *the meaning of the act appears to be that the provisional line of general route should, in the first place, be taken as the line upon which the grant was made, and, during the period while no other line was fixed than such line of general route, the lands in the odd-numbered sections within forty miles should be taken as the granted lands, and, therefore, they are declared by the statute to be the 'hereby granted' lands.*" (The italics are mine.).

Thus the court held that, because by section 6 the odd-numbered sections were withdrawn from sale or entry, and at the same time it was declared that the homestead and preëmption laws should apply to all other lands, there was an implied prohibition upon the Land Department's withdrawal of odd-numbered sections within the indemnity limits. Now it is held that the withdrawal directed by section 6 and made by the Secretary of the Interior was absolutely meaningless and secured nothing to the company. If the withdrawal directed by section 6 intended nothing, accomplished nothing, it should not have been made the basis for an implied prohibition of the hitherto unquestioned power of the Land Department to withdraw lands in indemnity limits. There is an incongruity in the two decisions which, to my mind, is, to use no stronger expression, both sad and startling.

Further, the Land Department did in fact withdraw from sale or entry all the odd-numbered sections within the forty-mile limits of the general route—and this withdrawal included the tract in controversy as well as the other odd-numbered sections —and notice thereof was filed in the local land office, and this many years before the plaintiff in error went upon the land. As heretofore stated, the power of the Land Department to withdraw from private entry lands which it has reason to believe may be necessary to satisfy a land grant has never been

denied.    It is a power which has been exercised again and again from the inception of land grants.    In one case, (*Wolcott* v. *Des Moines Company,* 5 Wall. 681,) we sustained a withdrawal made by the department beyond the real terminus of the grant on the ground that there was some doubt where the grant terminated, and therefore the department was justified in making the withdrawal cover any possible conclusion as to such terminus.    There was in the Northern Pacific act no prohibition on the Land Department's exercise of this customary power. Indeed, as I have shown, it was held in *Hewitt* v. *Schultz,* 180 U. S. 139, *supra,* that the express direction to withdraw lands in the place limits was the foundation of an implied prohibition on a withdrawal of lands within the indemnity limits.    The purpose and effect of a withdrawal are not to vest any title in the beneficiary of the grant, but to preserve the lands from private entry in order that when the time arrives the grantee may receive the full measure of its grant.    As said in *Menotti* v. *Dillon,* 167 U. S. 703, 720, 721 :

"It is true, as said in many cases, that the object of an executive order withdrawing from preëmption, private entry and sale, lands within the general route of a railroad is to preserve the lands, unencumbered, until the completion and acceptance of the road.    .   .   .    That order took these lands out of the public domain as between the railroad company and individuals, but they remained public lands under the full control of Congress, to be disposed of by it in its discretion at any time before they became the property of the company under an accepted definite location of its road."

This language was quoted with approval in *United States* v. *Oregon &c. Railroad Company,* 176 U. S. 28, 48.

Again, in *Northern Pacific Railroad* v. *Musser-Sauntry Company,* 168 U. S. 604, 607, we said :

"The withdrawal by the Secretary in aid of the grant to the State of Wisconsin was valid, and operated to withdraw the odd-numbered sections within its limits from disposal by the land officers of the government under the general land laws. The act of the Secretary was in effect a reservation."

And the same doctrine has been affirmed in many cases.

Turning to the rulings of the Land Department, in *Hestetun* v. *St. Paul &c. Railway Company*, 12 Land Dec. 27, 28, it was said by Secretary Noble:

" The legal effect of the withdrawal is to preclude the disposal of the land covered thereby, under any of the land laws. In other words, so long as the withdrawal remains in force the land covered thereby is simply held for the purpose for which the withdrawal was made."

And again, in the same volume, in *In re Chicago &c. Railway Company*, pp. 259, 261 :

" In the case of *Riley* v. *Wells*, referred to and quoted in the *Shire* case, it was said by the Supreme Court that settlement upon and possession of land within the limits of an executive withdrawal were 'without right,' and that the subsequent recognition by the land officers of such settlement and possession, and the permission to the party to make proof and entry under the preëmption law, and the issuing patent ' were acts in violation of law and void.' This case of *Riley* v. *Wells* has never been overruled or modified, but has been referred to and approved in a number of the decisions of the Supreme Court, and must therefore be accepted as expressing the opinion of that tribunal as to the absolute invalidity of settlements upon lands withdrawn by executive order."

In *In re Hans Oleson*, 28 Land Dec. 25, 31, Secretary Bliss thus defined the word " withdrawal " :

" In the nomenclature of the public land laws the word ' withdrawal' is generally used to denote an order issued by the President, Secretary of the Interior, Commissioner of the General Land Office, or other proper officer, whereby public lands are withheld from sale and entry under the general land laws, in order that presently or ultimately they may be applied to some designated public use, or disposed of in some special way. Sometimes these orders are not made until there is an immediate necessity therefor, but more frequently the necessity for their making is anticipated."

And in the same volume (*Inman* v. *Northern Pacific Railroad*) the same Secretary uses this language (pp. 95, 100):

" From the authorities cited the following rules are clearly

deducible: First. Subject only to the control and power of disposition remaining in Congress, an anticipatory withdrawal, whether legislative or executive, during the time it remains in force, withholds the lands embraced therein from other appropriation or disposition, and prevents the acquisition of any legal or equitable title or right by settlement or entry in violation of such withdrawal."

Similar declarations may be found in almost every volume of the Land Decisions.

In the execution of this Northern Pacific land grant many withdrawals were made as called for from time to time along the line of general route and the Land Department has uniformly recognized the validity and effect of such withdrawals. In *Northern Pacific Railroad* v. *Pressey*, 2 Land Dec. 551, it appeared that Pressey settled upon a tract within forty miles of the line of general route; that the lands at the time of his settlement were unsurveyed; that after survey he made application for a homestead entry, and it was held that he acquired no rights by his settlement, inasmuch as the land had been withdrawn by order of the Land Department, Secretary Teller saying (p. 553):

" The settlement by Pressey upon the odd section was clearly in violation of the order of withdrawal, and he could acquire no rights or equities under such a settlement."

In *Northern Pacific Railroad* v. *Miller*, 7 Land Dec. 100, a case in which the implied prohibition of the withdrawal of indemnity lands was first distinctly decided in the Land Department, Secretary Vilas said (p. 110) in reference to the withdrawal of lands within the place limits of the line of general route:

" Thus the action of the company and of the department cooperated to give official determination to the fact upon which the statute became applicable, both to withdraw the odd-numbered sections and to double the minimum price of the even-numbered sections, and both effects were formally recognized and declared. It cannot be doubted that, had no other action been taken before the line of the road for construction was definitely located, this action in regard to the line of the general route of 1870, must have remained continuously operative upon

all lands within the limit of forty miles on either side of the line so established. So obvious is this, indeed, that from the mouth of the Walla Walla River, westwardly along the Columbia, that withdrawal remains to this day obligatory and operative by force of the statute and of that location.

"If authority be wanting to so manifest a proposition, it is found in the following language of the Supreme Court in the case already referred to."

In *McClure* v. *Northern Pacific Railroad*, 9 Land Dec. 155, in an opinion by Secretary Noble, it was held that, "when the map of general route was filed, the withdrawal thereunder became at once effective, and reserved from general disposal the odd-numbered sections embraced therein."

In *Northern Pacific Railroad* v. *Collins*, 14 Land Dec. 484, it was again decided by the same Secretary that "lands withdrawn for the benefit of said grant are not subject to settlement."

In *Central Pacific Railroad* v. *Beck*, 19 Land Dec. 100, which was also a settlement upon unsurveyed land within the place limits of the general route of the road, and in which a withdrawal had been ordered in accordance with the provisions of the act making the grant, Secretary Smith, sustaining the title of the railroad company, said (p. 103):

"I am clearly of the opinion that after the withdrawal made upon the map of general route, no rights could be acquired adverse to the company by settlement upon the land, and that a settlement so made, even though it existed at the date of the filing of the map of definite location, would not serve to except the land settled upon from the operation of the grant to said company."

In the very last volume of the Land Decisions (vol. 30, p. 247,) in respect to the Southern Pacific Railroad Company, whose granting act contained a similar provision in reference to withdrawal on the filing of a map of general route, it was said by Secretary Hitchcock (p. 249):

"As between individual claimants and the company no claim could be predicated upon settlement or entry made after the filing of the map of general route, and as against such claims

the grant in effect was operative from April 3, 1871, the date upon which the map of general route was filed."

So that from the beginning until the present time in construing this grant and others containing like provision there has been an unbroken line of decisions in the Land Department to the effect that a withdrawal made on the filing of the map of general route prevents any private claims attaching to the odd-numbered sections of land ; and this whether the lands were surveyed or unsurveyed.   Indeed, when Congress in the sixth section expressly declared that the lands "shall not be liable to sale, or entry, or preëmption before or after they are surveyed," it would seem as though it had made every provision which language was capable of expressing to reserve from private entry for the benefit of the railroad company all odd-numbered sections, surveyed or unsurveyed, within the place limits of the line of general route.

I have already quoted from *Hewitt* v. *Schultz*, 180 U. S. 139, in reference to the duty of following, in case of ambiguity, the construction given to a statute by the department charged with the execution of such statute.   That doctrine was there applied although it appeared that the practice of the department during the building of the railroad had been one way and only changed after its completion, and the latter construction was upheld by this court as the ruling of the department.   It was said (p. 156):

"It was admitted at the hearing that the construction of the Northern Pacific act of 1864 announced by Secretary Vilas had been adhered to in the administration of the public lands by the Land Department.   We are now asked to overthrow that construction by holding that it was competent for the Land Department, immediately upon the definite location of the line of the railroad, to withdraw from the settlement laws all the odd-numbered sections within the indemnity limits as defined by the act of Congress.   If this were done it is to be apprehended that great if not endless confusion would ensue in the administration of the public lands and that the rights of a vast number of people who have acquired homes under the preëmption and homestead laws, in reliance upon the ruling of Secretary Vilas and his successors in office, would be destroyed."

Now we have a case in which the ruling of the department has been unchanged from the commencement to the present time—a ruling which Secretary Vilas in 7 Land Dec. *supra,* called " so manifest a proposition," and it is wholly disregarded. The recent and temporary ruling of the Land Department was in the former case sustained in order, as was said, to protect the settler. Here the continuous practice of the department is disregarded and the patent issued by it to the railroad company is overthrown.

Still again, the company, by reason of section 6, believing that a withdrawal was to be made which should operate to its benefit, filed a map of general route, and a withdrawal was made of the odd-numbered sections of land. It is now held that such withdrawal did not withdraw the odd-numbered sections from entry and sale, but they remained still open to entry or purchase under the land laws. If that be the true construction, it follows that, whereas, if the company had filed no map of general route, no one would know where its line of road was to be until after it filed the map of definite location, and then the title would attach to all odd-numbered sections not burdened with existing claims. But by filing the map of general route, as it did eleven years before filing the map of definite location, it notified everybody of the proposed route, and so all settlers could take advantage of that knowledge and enter the odd-numbered sections contiguous thereto. Having this knowledge of where the line was to be located, of course settlers would come as near to that line as possible, in order to take advantage of the increased value coming from the construction of the road, and so taking advantage of the notice given would deplete the grant of lands which Congress had intended for the benefit of the company.

But this question has been definitely decided by this court. *Buttz* v. *Northern Pacific Railroad Company,* 119 U. S. 55. That was an action brought by the railroad company for the possession of a tract of land within forty miles of the general route as also of the line of definite location of plaintiff's road. The defendant entered upon the land in October, 1871, he at the time possessing all the qualifications of a preëmptor and in-

tending to obtain title by preëmption. At that time the tract was, with others, in the occupation of the Sioux Indians. An agreement for the surrender by the Indians of all their rights was ratified on May 19, 1873. On May 26, 1873, the company filed in the Land Department its map of definite location. The defendant was therefore in occupation of the tract with intent to preëmpt it for seven days after the rights of the Indians had ceased and before the filing of the map of definite location. So if the opinion of the court now announced had prevailed the defendant was entitled to hold that tract as against the company. On the 11th of August, 1873, he presented his application for entry, which was refused, and refused because it was within the forty-mile limit, as shown by a map of general route filed on February 21, 1872. This presents the precise question here involved. The unanimous opinion of the court sustained the action of the Land Department in refusing defendant's application to enter and confirmed the title of the railroad company. In the course of the opinion, by Mr. Justice Field, it was said (p. 72):

"When the general route of the road is thus fixed in good faith, and information thereof given to the Land Department by filing the map thereof with the Commissioner of the General Land Office, or the Secretary of the Interior, the law withdraws from sale or preëmption the odd sections to the extent of forty miles on each side. The object of the law in this particular is plain; it is to preserve the land for the company to which, in aid of the construction of the road, it is granted. . . . Nor is there anything inconsistent with this view of the sixth section as to the general route, in the clause in the third section making the grant operative only upon such odd sections as have not been reserved, sold, granted, or otherwise appropriated, and to which preëmption and other rights and claims have not attached, when a map of the definite location has been filed. The third section does not embrace sales and preëmptions in cases where the sixth section declares that the land shall not be subject to sale or preëmption. The two sections must be so construed as to give effect to both, if that be practicable."

This decision, rendered seventeen years ago, has never hitherto

been overruled. It was reaffirmed in *St. Paul & Pacific Railroad Company* v. *Northern Pacific Railroad Company*, 139 U. S. 1, 17, 18, in which, speaking for a unanimous court, Mr. Justice Field said :

" Besides, the withdrawal made by the Secretary of the Interior of lands within the forty-mile limit, on the 13th of August, 1870, preserved the lands for the benefit of the Northern Pacific Railroad from the operation of any subsequent grants to other companies not specifically declared to cover the premises. The Northern Pacific act directed that the President should cause the lands to be surveyed forty miles in width on both sides of the entire line of the road, after the general route should be fixed, and as fast as might be required by the construction of the road, and provided that the odd sections of lands granted should not be liable to sale, entry or preëmption before or after they were surveyed, except by the company. They were therefore excepted by that legislation from grants, independently of the withdrawal by the Secretary of the Interior. His action in formally announcing their withdrawal was only giving publicity to what the law itself declared. The object of the withdrawal was to preserve the land unencumbered until the completion and acceptance of the road. . . . After such withdrawal, no interest in the lands granted can be acquired, against the rights of the company, except by special legislative declaration, nor, indeed, in the absence of its announcement, after the general route is fixed."

In the opinion of the majority some later cases are referred to which are said to qualify the decision in *Buttz* v. *Northern Pacific Railroad Company*. But even the slightest attention to what was decided in those cases shows that in no manner do they qualify or limit that decision so far as it affects the present question. Before noticing those cases it is well to consider what was the purpose and effect of section 6. It was not a granting section. It did not purport to give title to anything to the company. Its whole scope and effect was to withdraw from sale, entry or preëmption the odd-numbered sections in order that when the company filed its map of definite location it might secure those odd-numbered sections. The grant was

made only by section 3 and attached to particular lands when the map of definite location was filed, but the proposition laid down in the *Butts* case—and the proposition I am contending for here—is that this plaintiff in error could acquire nothing by his entry upon an odd-numbered section after the filing of the map of general route and the withdrawal; that the tract was therefore free from a claim of any kind when the map of definite location was filed, and so there was nothing to prevent the railroad company from receiving, title.

Now the cases referred to are *St. Paul & Pacific* v. *Northern Pacific*, 139 U. S. 1; *United States* v. *Northern Pacific Railroad Company*, 152 U. S. 284; *Northern Pacific Railroad Company* v. *Sanders*, 166 U. S. 620; *Menotti* v. *Dillon*, 167 U. S. 703; *United States* v. *Oregon &c. Land Company*, 176 U. S. 28; *Wilcox* v. *Eastern Oregon Land Company*, 176 U. S. 51, and *Messinger* v. *Same*, 176 U. S. 58. After quoting from the opinions in some the court sums up by saying "the cases above cited definitely determine that the railroad company acquired no vested interest in any particular section of land until after a definite location was shown by an accepted map of its line." This is a proposition among the A, B, C's of public land law and needed no authorities in support thereof. But that proposition throws no light on the question as to the scope of the withdrawal given by section 6, and when the cases themselves are referred to not one of them conflicts with the proposition I have heretofore laid down. I have already shown what was decided in *St. Paul & Pacific* v. *Northern Pacific*, and need not repeat. In *United States* v. *Northern Pacific Railroad Company* it appeared that the Northern Pacific Railroad Company had attempted to locate a line from Portland directly north to Puget Sound, and in 1865 had filed a map of the general route thereof. Such a line was not within the authority granted by the act of Congress incorporating the Northern Pacific Railroad Company. On May 4, 1870, Congress made a land grant to the Oregon Central Railroad Company which included some of the lands within the forty-mile limits of the above-mentioned general route. On May 31, 1870, and twenty-seven days after the grant to the Oregon Central Railroad

Company, Congress passed an act which authorized the Northern Pacific Company to construct a line from Portland to Puget Sound, with the privileges and grants provided for in the original act of incorporation, and it was held that the rights of the Oregon Central Railroad Company antedated and were superior to those of the Northern Pacific. First in time, first in right, is as to lands within place limits the settled rule of railroad land grants. What possible bearing this decision can have upon the case before us it is hard to conceive. In *Northern Pacific Railroad Company* v. *Sanders*, 166 U. S. 620, the lands in controversy were claimed as mineral lands, and applications for entry of them as such were pending in the Land Department. The court had held in *Barden* v. *Northern Pacific Railroad Company*, 154 U. S. 288, that mineral lands did not pass under the grant to the railroad company, and that whether they were known or not known to be mineral lands at the time of the filing of the map of definite location was immaterial. Of course, it followed that whether they were known or not known at the time of the filing of the map of general route was also immaterial. The lands were of such a character as could not in any event pass to the railroad company any more than the even-numbered sections. They were not withdrawn by filing the map of general route; they did not pass by filing the map of definite location. The four remaining cases all proceeded upon the one proposition that the mere filing of the map of general route does not preclude Congress from making subsequently thereto and prior to the filing of the map of definite location—that is, prior to the time when title vested in the company—any other specific grant of the reserved lands. In other words, until the proposed grantee shall have done all that is necessary to vest title in it, there remains in Congress the power to make other disposition of the lands. But this was no new doctrine in the public land law. It was laid down in *Frisbie* v. *Whitney*, 9 Wall. 187; in the well-known *Yosemite Valley Case*, 15 Wall. 77, and has been followed in many cases since. Of course, Congress could at any time before the filing of the map of definite location and while the title of the company was still inchoate, reserve any

of the lands for military or other purposes or make a specific grant of them to individuals or corporations. But as said in *St. Paul & Pacific Railroad Company* v. *Northern Pacific Railroad Company*, 139 U. S. 1, 18, "after such withdrawal, no interest in the lands granted can be acquired, against the rights of the company, except by special legislative declaration," and in this case there has been no such legislative declaration.

But it is said that the case of the plaintiff in error is " placed on impregnable ground by the act of May 4, 1880, c. 89." I pass the proposition that this is a general act for the relief of settlers on public lands and the familiar doctrine that a general law passed after a special act does not interfere with the provisions of that act, provided there is room for the operation of both, and there is ample room for the operation of this act on public lands generally without interfering with the special provisions made in the Northern Pacific grant. But the act itself has no force whatever as applied to the present question. The provision is that one who is a settler on any of the public lands of the United States " with the intention of claiming the same under the homestead laws, shall be allowed the same time to file his homestead application and perfect his original entry in the United States land office as is now allowed to settlers under the preëmption laws to put their claims on record, and his right shall relate back to the date of settlement, the same as if he settled under the preëmption laws." If we turn to the preëmption law we find, Revised Statutes, section 2264, that a person intending to preëmpt shall " within thirty days after the date of such settlement, file with the register of the proper district a written statement." That is, the preëmptioner had thirty days after settlement within which to make his entry, while when we turn to the homestead law, Revised Statutes, section 2290, we find that a party seeking to homestead " shall, upon application to the register of the land office in which he is about to make such entry, make affidavit . . . that his entry is made for the purpose of actual settlement and cultivation." In other words, his right is initiated by the application to enter, and does not relate back to any settlement, and this statute simply gives him a right of thirty days' occupancy be-

fore making his application to enter. How such a statute, equalizing the rights of one seeking to make a homestead entry with those of one seeking to make preëmption, can have any pertinency to the question before us passes my comprehension.

Again, several pages of the opinion are taken up with references to quotations from opinions in the Land Department as to the meaning of the term " occupied by homestead settlers." Here again I am unable to see the pertinency of these references. If there had been no withdrawal and the question arose as to the effect of plaintiff in error's occupancy of the land as against the rights of the company obtained by the map of definite location these authorities might be worth considering, but they throw no light upon the effect of the withdrawal, which is the question before us.

The fact that this tract was not surveyed at the time the plaintiff in error entered upon it nor until after the completion of the road is immaterial. By the terms of section 6 the prohibition against sale, entry or preëmption extended to lands " before or after they are surveyed." Reference is made to several cases in which we held that the rights of a settler were not lost by the failure of the government to make a survey prior to his occupation. But those decisions were to the effect that the settler loses nothing by the neglect of the government. Here it is held that he gains something. If the survey had been completed before he commenced his occupation, and he could not then enter an odd-numbered section, surely he could not, in face of the prohibition of the section, enter the land after it had been surveyed. If instead of going upon lands that had been surveyed the settler chose to go into unsurveyed territory, he took his chances of placing his improvements upon an odd or even-numbered section. If he placed them upon what proved to be an odd-numbered section, he acquired no right as against the grant to the company. If he put them on what proved to be an even-numbered section, he would be compelled to pay the government double price. In the latter event does any one for a moment suppose that it would be an answer to the demand for a double price that the government had failed to make a survey before he chose to occupy the land and make

improvements thereon ? The construction placed by the majority not only takes from the railroad company the land which was granted to it, but deprives the government of that which it intended to obtain, a double price for the lands it reserved for sale.

Finally, I may say this decision clouds the title to all the lands granted to the railroad company. At the time the map of definite location was filed, as well as at the time the road was completed, there was not on the records of the Land Department a single word or mark which indicated to anybody that plaintiff in error was on the land or claiming it, or that the title of the railroad company was other than perfect. But because plaintiff in error was on the land it is held that the patent of the government to the railroad company conveyed to it no title, and that this occupant by parol testimony may show the fact of his occupancy and overthrow the record title. Yet this court unanimously held in *Northern Pacific Railroad* v. *Colburn*, 164 U. S. 383, that mere occupation, unaccompanied by the filing of a claim in the land office, did not exclude a tract from the operation of the land grant. And that there was no oversight or lack of attention to this particular matter is shown by the fact that the United States promptly filed a brief of thirty-six pages, quoting the principal land decisions referred to in the opinion of the majority, and asked the court to reconsider its decision, which application was denied without dissent. Indeed, as appears from the authorities cited in that opinion, the conclusion was in accord with prior rulings, to the effect that there must be something of record in the Land Department to support the contention of an adverse right. That unanimous opinion of the court is put one side by the assertion that the land there in controversy had been surveyed while in this it had not been. No distinction was made in the discussion between surveyed and unsurveyed lands, no suggestion that it affected the question in the slightest degree, and, as we have seen, the prohibition against sale, entry or preëmption in section 6 extended to lands unsurveyed as well as surveyed. How can one say in respect to any tract claimed by the railroad company that it was not at the time of the filing of the map of definite

location in the occupation of some one intending to preëmpt or homestead it? If such occupation is sufficient to avoid the patent of the United States, has the company sure title to any lands?

I think the judgment ought to be affirmed.